**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George Paul WOLF, III,**
**Defendant-Appellant.**

**No. 86–5186.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 6, 1987.

Decided March 26, 1987.

Peter K. Nunez, Bruce R. Catetter, and Edward P. Allard, III, San Diego, Cal., for plaintiff-appellee.

Barry D. Utsinger, San Diego, Cal., for defendant-appellant.

Before PREGERSON and NORRIS, Circuit Judges, and BURNS,* District Judge.

NORRIS, Circuit Judge:

George Paul Wolf III drove a stolen van from Coronado, California, to Ensenada, Mexico, where he was arrested by Mexican authorities. He was convicted of violating both 18 U.S.C. § 2312[1] for transporting in foreign commerce a motor vehicle known to be stolen and 18 U.S.C. § 2313[2] for possessing a stolen vehicle which had crossed a United States boundary. The district court imposed a five-year sentence for the transportation offense and a separate sentence of five years' probation for the pos-

---

* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

1. Section 2312 ("Transportation of Stolen Vehicles") provides that:

    [w]hoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

2. Section 2313 ("Sale or Receipt of Stolen Vehicles") provides that:

    [w]hoever receives, possesses, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, which has crossed a State or United States boundary after being stolen, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

session offense, the sentences to run consecutively.

Wolf raises three arguments on appeal: (1) the admission into evidence of a confession made to Mexican authorities violated the due process and self-incrimination clauses of the Fifth Amendment because it was the product of coercion; (2) the prosecutor knowingly relied on perjured testimony in violation of the due process clause; and (3) the imposition of separate sentences for transporting in foreign commerce and possessing the same motor vehicle violated the double jeopardy clause of the Fifth Amendment.

## I

## THE INVOLUNTARY CONFESSION ISSUE

On September 20, 1985, Wolf was stopped while in possession of a stolen van in Ensenada, Mexico, by an officer of the Mexican Federal Highway Patrol. Commandante Raul Vasquez-Miranda (Vasquez) was summoned to question Wolf about his activities. Wolf explained to Vasquez that his friend Johnson had loaned him the van and that he was going to Ensenada to see a friend named Chico. When Wolf could not provide Johnson's address, Vasquez decided to take Wolf to Vasquez' office for further questioning. Vasquez consulted the California Highway Patrol and learned that the van had been reported stolen. Armed with this knowledge, Vasquez confronted Wolf, accused him of lying, and demanded that he tell Vasquez the truth. Wolf then confessed that he had stolen the van three days earlier and that he was driving to Ensenada to deliver the van to Chico.

Wolf contends on appeal that the government's use of his confession as evidence during the trial violated his due process rights because his confession was coerced.[3] The crux of Wolf's coercion argument is that Vasquez threatened him with physical violence unless he confessed.[4] It is undisputed that, during the questioning, Vasquez told Wolf to "[t]ell me the truth and

**3.** Wolf's argument necessarily assumes that the due process clause, which affords defendants a right not to be convicted based upon involuntary confessions, can be invoked when the confession is allegedly coerced by foreign police. We have generally held that prophylactic constitutional rules designed to deter police misconduct do not apply to foreign police behavior. *See, e.g., United States v. Chavarria,* 443 F.2d 904, 905 (9th Cir.1971) (per curiam) (*Miranda* rules inapplicable to Mexican police interrogations); *Brulay v. United States,* 383 F.2d 345, 348 (9th Cir.) (Fourth Amendment exclusionary rule does not apply to illegal searches conducted by Mexican authorities acting without substantial involvement by American officials), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). Nevertheless, in *Brulay* we held that the Fifth Amendment bars the use in an American trial of involuntary confessions obtained at the hands of Mexican police. *Id.* at 349 n. 5. Our ruling was based on the understanding that a confession's introduction into evidence in an American court triggers constitutional scrutiny: "It is not until the statement is received in evidence that the violation of the Fifth Amendment becomes complete." *Id.*

The continuing vitality of this holding in *Brulay* was cast into serious doubt by *Colorado v. Connelly,* —— U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), where the Supreme Court considered a defendant's claim that his confession was "involuntary" because it was the product of mental delusion. While admittedly no state action was responsible for eliciting the confession, the defendant argued that the introduction of the confession as evidence in a criminal proceeding constituted a state action depriving him of his right not to be convicted based upon an involuntary confession. The Court rejected this argument, holding that the introduction of evidence into a judicial proceeding does not by itself satisfy the "state action" requirement for triggering the constitutional protection against involuntary confessions. According to the Court, such an understanding "fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." 107 S.Ct. at 521.

Because the apparent tension between *Connelly* and *Brulay* was not argued or briefed, and because in any case we hold that Wolf's confession was not unconstitutionally coerced, we need not determine *Brulay*'s continuing vitality in light of *Connelly* or consider whether there is any other basis for extending the constitutional rule at issue here to the govern the conduct of foreign police. Rather, we assume without deciding that the constitutional protection against involuntary confessions applies to confessions coerced by foreign police.

**4.** Wolf does not contend that Vasquez or any other Mexican police official actually hit or physically abused him at any time.

maybe I'll help you." Reporter's Transcript of Jury Trial ("R.T.") at 48. Wolf argues that the kind of "help" Vasquez promised was to protect him from being beaten, either by Vasquez himself or by other Mexican officers.

Wolf cites the following testimony as proof that he was verbally threatened by Vasquez during interrogation:[5]

**CROSS–EXAMINATION OF VASQUEZ BY WOLF**

Q. And you say that if I would talk to you, you could help me; is that correct?
A. Yes.
Q. Now, could you elaborate on that a little bit? Could you tell the Court what it was that you said to me to get me to talk? Did you say you would let me go if I would talk and avoid hitting me like that?
A. It is true, that's what I told you.
Q. Very well. I argue that the statement was involuntary and was based upon violated plea bargaining. He has admitted it right in court.[6]

\* \* \* \* \* \*

**REDIRECT EXAMINATION OF VASQUEZ BY GOVERNMENT COUNSEL**

Q. Commander Vasquez, did you ever threaten to hit the defendant if he didn't talk to you?
A. No.
Q. What did you promise him if he told you the truth, if anything?
A. To help him in the report, with the purpose of other authorities would not beat him. That's all I promised him. I could not release him. I could not release him. The vehicle had already been reported stolen. I had to comply.[7]

\* \* \* \* \* \*

**RECROSS OF VASQUEZ BY WOLF**

Q. Now, you say that if I told the truth, I would not be beaten by other policeman, the state judicial police force, specifically?
A. Maybe.
. . . .
Q. [I]s it or is it not true that you asked me if I would just tell you who I am selling the vehicles to, you would let me go?
A. No, not release you, but I was going to help you, but I never said what kind of help.[8]

Wolf contends that this colloquy proves that when Vasquez offered to "help" Wolf if he talked, Vasquez meant that he would protect Wolf from being beaten by Mexican police.

Wolf also argues that other circumstances surrounding his confession support his claim of coercion. First, he maintains that even subtle threats by Mexican officers justifiably evoke great fear due to frequently published accounts of torture of American prisoners by Mexican authorities. Second, he points out that he was isolated from his family and friends and was not informed of any right against self-incrimination or any right to consult an attorney.[9] Third, he notes that he initially refused to talk and his confession immediately followed the alleged threats. Finally, he points out that his confession was in fact not entirely accurate[10] and argues that the inaccuracy suggests that he did not confess out of a desire to "come clean" but rather that he was coerced into giving some sort of inculpatory statement to avoid being beaten.

The government takes issue with Wolf's characterization of Vasquez' testimony, contending that when Vasquez' statements are viewed in context, it is unreasonable to

---

**5.** This colloquy took place during a pre-trial hearing on Wolf's motion to suppress his confession. Wolf represented himself at this hearing as well as at trial.

**6.** R.T. at 52–53.

**7.** R.T. at 69.

**8.** R.T. at 70.

**9.** The absence of *Miranda* warnings does not automatically taint his confession, as *Miranda*'s prophylactic exclusionary rule does not apply to foreign police authorities. *Chavarria*, 443 F.2d at 905.

**10.** Wolf admitted to stealing the van from a parking lot in El Cajon, when in fact it was stolen from a driveway in Coronado.

interpret his vague promise of "help" as implying that he would protect Wolf from being beaten if Wolf talked. The government suggests rather that Vasquez simply promised Wolf "[t]o help him in the report." [11] While admittedly Vasquez testified at the suppression hearing that his purpose in offering Wolf help was to make sure "other authorities would not beat him," [12] the government contends that Vasquez never communicated this purpose to Wolf during the interrogation. Rather, Vasquez' purpose in helping Wolf was disclosed solely to the judge presiding over the suppression hearing. In support of this interpretation of the transcript, the government emphasizes that Vasquez clearly testified that during the interrogation he "never said what kind of help" he would provide Wolf.[13] The government suggests that any other ambiguous statements supporting an inference that Vasquez threatened Wolf were the product of language difficulties (Vasquez' examination was conducted through a Spanish interpreter) and Wolf's use of compound and leading questions during cross-examination. Finally, the government also points out that Wolf told FBI agent Ryan three weeks later "he was treated by [the Mexican highway patrol] fairly" and that Wolf did not complain to Ryan of being beaten or threatened.[14]

■ Due process does not bar the use of a confession as evidence unless government officials employed coercive interrogation tactics which rendered the defendant's confession "involuntary" as a matter of law. In *Colorado v. Connelly*, — U.S. ——, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the Court explained that "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 521. Rather,

> [w]hile each confession case has turned on its own set of factors justifying the conclusion that police conduct was op-

pressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*Id.* at 520; *see also Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985) ("the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means[,] as on whether the defendant's will was in fact overborne").

■ In determining whether the tactics used by the Mexican police were coercive to the point of violating Wolf's due process rights, we review the district court's factual account of what happened during Wolf's interrogation under the clearly erroneous test. *See United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). We review *de novo* the court's conclusion that the confession was voluntary because *Connelly*'s focus on the constitutional acceptability of the government conduct rather than merely on the defendant's state of mind at the time of the confession "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles...." *Id.* at 1202; *see also Crane v. Kentucky*, — U.S. ——, 106 S.Ct. 2142, 2145, 90 L.Ed.2d 636 (1986) ("manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness"); *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985) (in a habeas corpus proceeding the federal court need not defer to a state court's finding that a confession was voluntary because "the ultimate issue of 'voluntariness' is a legal question requiring inde-

---

11. R.T. at 69.

12. R.T. at 69.

13. R.T. at 70.

14. R.T. at 90–91.

pendent federal determination" and not a question of historical fact).

After hearing and assessing the credibility of the witnesses testifying at the suppression hearing, the district court denied Wolf's motion to suppress his confession to Vasquez. The court declared that:

> As far as I'm concerned there's no evidence to indicate that the confession or statement ... was made involuntarily. As a matter of fact, everything points to the fact that it was voluntary, and even to the fact that Mr. Wolf has explained to Mr. Ryan ... at the time he was free, that he was treated fairly by Mexican authorities.[15]

Whether Vasquez in fact ever verbally threatened Wolf during interrogation is a question of historical fact, and we interpret the district court's finding on voluntariness as accepting the government's contention that Vasquez never threatened Wolf. Deference to the district court's factual finding is especially warranted here when the critical evidence is testimonial; the "judge was in the unique position to observe the demeanor of both [the defendant] and the police officers while we have only the cold record, which is sterile by comparison." *United States v. Hood*, 493 F.2d 677, 680 (9th Cir.), *cert. denied*, 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). *See United States v. Bogart*, 783 F.2d 1428, 1434 (9th Cir.), *vacated on other grounds with respect to one defendant sub nom. United States v. Wingender*, 790 F.2d 802 (1986). Here the district court concluded that there was "no evidence" that Wolf's confession was involuntary. Given the ambiguity of Vasquez' testimony and the clarity of agent Ryan's, the court's implicit finding that Wolf was not threatened with beatings by Mexican authorities is not clearly erroneous.

Once stripped of the claim that he was threatened, Wolf's argument that his confession was coerced is meritless. There was nothing exceptional about the duration or location of the questioning, and it certainly is not unusual for a suspect to have no family or friends present. The fact that Vasquez accused Wolf of lying does not automatically render the questioning coercive, as an interrogator can legitimately express his disbelief at a defendant's story in order to elicit further comments or explanations. Moreover, we have previously rejected the notion that the fact that a suspect interrogated by foreign police received no *Miranda* warnings, without more, dictates the conclusion that a confession was coerced. *See Chavarria*, 443 F.2d at 905. We therefore affirm the district court's denial of Wolf's motion to suppress his confession.[16]

---

15. R.T. at 101.

16. In addition to arguing that the use of his confession violated his due process rights, Wolf also contends that the use of his confession violated his right against self-incrimination. Assuming *arguendo* that the right against self-incrimination applies to situations involving foreign police, *see supra* note 3, Wolf's self-incrimination argument fares no better on these facts than his due process claim.

Ninth Circuit cases have recognized that the government cannot introduce into evidence a confession elicited from a defendant during custodial interrogation unless it proves that the defendant voluntarily waived her right against self-incrimination so that her confession was the "product of a rational intellect and a free will." *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir.1986) (citations omitted). Because this focus on the defendant's subjective state of mind at the time of the waiver raises a "mixed question[ ] [of law and fact] in which the applicable legal standard provides for a strictly factual test," *McConney*, 728 F.2d at 1203, we have reviewed the voluntariness of a waiver of the right against self-incrimination under the clearly erroneous test. *See, e.g., United States v. Doe*, 787 F.2d 1290, 1292–93 (9th Cir.1986).

In *Colorado v. Connelly*, the Supreme Court cast some doubt on this understanding of the voluntariness inquiry governing waivers of the right to silence when it rejected the defendant's argument that he did not "voluntarily" waive his right against self-incrimination because he felt compelled to confess by mental delusions. Writing for the Court, Chief Justice Rehnquist explained that the "voluntariness of a waiver of this privilege [against self-incrimination] has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." 107 S.Ct. at 523. It is not clear from Chief Justice Rehnquist's opinion in which of three senses "police overreaching" is a prerequisite for finding a waiver involuntary. He might have meant that the voluntariness of a waiver for self-incrimination purposes, like the voluntariness of a confession for due process purposes, turns *solely* on the objective constitu-

## II

### THE KNOWING USE OF PERJURED TESTIMONY ISSUE

Wolf next argues that Commandante Vasquez lied during his trial testimony when he denied having threatened Wolf in order to secure a confession.[17] He asserts that the prosecution clearly knew Vasquez lied because Vasquez had admitted just the day before at the suppression hearing that he had indeed threatened Wolf. Wolf claims that the government's knowing use of perjury violated his right to due process.[18]

■ Wolf's argument assumes that Vasquez did indeed threaten Wolf during the interrogation and that he had unequivocably admitted as much during the suppression hearing.[19] This assumption is belied by the district court's implicit finding of fact that Wolf was not threatened by the Mexican authorities. *See ante* at 973. Wolf's claim that Vasquez was clearly lying when he denied at trial that he had threatened Wolf is therefore unpersuasive.

■ Indeed, the most Wolf can fairly claim is that Vasquez' testimony at trial was inconsistent with his testimony at the suppression hearing. Assuming *arguendo* that the testimony was somewhat inconsistent,[20] Wolf had a fair opportunity to exploit the inconsistency during his cross-examina-

tional acceptability of the police conduct. In this event the constitutional inquiry would no longer turn on the defendant's subjective state of mind, and *Pinion* and *Doe* would be questionable authority. Alternatively, Chief Justice Rehnquist might have meant that the voluntariness question involves a two-step inquiry: a waiver is deemed involuntary only if both the police used objectively unacceptable coercion *and* the defendant's subjective will was in fact overborne. Finally, the Chief Justice might have meant to embrace the much more limited proposition that, though the real focus of the voluntariness inquiry is *solely* on whether the defendant's subjective will was in fact overborne and not on the objective acceptability of the police's conduct, the waiver must still as a matter of fact have been induced by some minimal form of police action. Since in *Connelly* the defendant volunteered his testimony without any urging whatsoever by police, this final understanding of the waiver doctrine—that some form of state action is a necessary factual predicate to finding a confession involuntary because the defendant's subjective will was overborne—would be sufficient to explain the Court's holding.

We need not decide here whether Chief Justice Rehnquist's reasoning in *Connelly* undermines *Pinion* or *Doe*, as Wolf would have no colorable claim that his right against self-incrimination was violated whichever version of the waiver issue is correct. Under *de novo* review, we reject the claim that the police used objectively unacceptable methods to coerce Wolf into waiving his right to silence for the same reasons that we reject his due process claim. And under the clearly erroneous test, we uphold the district court's conclusion that there is "no evidence" to support Wolf's claim that his waiver was involuntary in the sense that his subjective will was overborne. Given these two conclusions, Wolf's self-incrimination argument is clearly meritless under any plausible version of the waiver issue.

17. At trial, the following colloquy took place during Wolf's cross-examination of Vasquez:
Q. [W]hen we got to your station, did you tell me that if I would confess, you would let me go?
A. No.
Q. [D]id you ever tell me if I confessed that the state judicial police would not beat me?
A. No.
....
Q. Didn't you answer yes to all those questions yesterday under oath [at the suppression hearing]?
A. No.
R.T. at 147.

18. [T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). *See, e.g., California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984); *United States v. Butler*, 567 F.2d 885, 891 (9th Cir.1978) (per curiam).

19. Wolf offers no other evidence supporting his claim that Vasquez' trial testimony was false or that the government knew it to be so other than the testimony's alleged inconsistency with Vasquez' testimony at the suppression hearing the previous day.

20. The alleged inconsistency between Vasquez' testimony at trial and his testimony at the suppression hearing seems to us far from obvious. Vasquez' negative answer at trial to the question "did you tell me that if I would confess, you would let me go?" was consistent with his repeated claim during the suppression hearing that he had never told Wolf he would or even could let Wolf go if Wolf confessed. Vasquez'

tion. His failure to do so cannot somehow render the prosecution guilty of depriving him of his due process rights by misleading the jury in a way that was fundamentally unfair.

## III

## THE DOUBLE JEOPARDY ISSUE

Wolf's final argument is that the double jeopardy clause of the Fifth Amendment, which "protects against multiple punishments for the same offense," *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969),[21] protects him against separate punishment for transporting the van in foreign commerce and for possessing the same van while transporting it. *Appellant's Brief*, at 21. Because "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended," *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983), whether Wolf can be punished separately for transporting the van and possessing it turns on congressional intent.

Relying upon *United States v. Sanford*, 673 F.2d 1070 (9th Cir.1982), Wolf argues that Congress could not have intended double punishment because his possession of the stolen van was at all times "incidental to and necessarily included within the [illegal] transportation." *Appellant's Opening Brief*, at 21. In *Sanford*, we held that separate punishments may not be imposed for the transfer of counterfeit notes and for possession of the same notes "when there is no evidence of possession apart from the evidence of transfer." 673 F.2d at 1074.

We recently embraced the reasoning underlying *Sanford* in *United States v. Palafox*, 764 F.2d 558 (9th Cir.1985) (en banc).

When an undercover agent negotiating to buy heroin from Palafox asked for a sample to inspect, Palafox handed over a package of heroin, which the agent promptly returned after removing a small quantity. Palafox was immediately arrested and convicted both of possessing heroin with intent to distribute and of actually distributing heroin. We held that only one punishment could be imposed because Congress did not intend to authorize punishment for both possessing and distributing contraband when "each offense [was] committed at virtually the same time, in the same place, and with the same participants." *Id.* at 562.

The Supreme Court employed similar reasoning in *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), where the defendant was sentenced separately for receiving a firearm shipped in interstate commerce and for possessing the same firearm. The Supreme Court held that the defendant could be sentenced only once because Congress did not intend to authorize separate punishment for illegally possessing a firearm while receiving it when "proof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon." *Id.* at 1672.

In all three cases, the proof of possession was limited to a momentary period of time necessary to commit an additional statutory offense, whether transfer of counterfeit notes (*Sanford*), distribution of heroin (*Palafox*), or receiving a firearm (*Ball*). In contrast, when the proof of possession was not limited to the same time and place that the additional offense was committed, we have held that separate punishment for possession and the other offense is permissible. For example, in *United States v. Rodriguez-Ramirez*, 777 F.2d 454 (9th Cir.

negative answer at trial to the question "did you ever tell me if I confessed that the state judicial police would not beat me?" is consistent with the government's interpretation that Vasquez' statement about other Mexican authorities was made to the judge at the suppression hearing but never articulated in front of Wolf during the interrogation. Finally, Vasquez' negative answer at trial to the question "didn't you answer

yes to all those questions yesterday under oath?" was not clearly false, as the questions asked at trial were worded quite differently than those asked during the suppression hearing.

21. The double jeopardy clause provides that "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." *U.S. Const.* amend. V.

1985), a defendant gave heroin samples to an undercover agent and retained possession of the remainder of his stash for two days before he was arrested. We held that "[b]ecause the distribution of the sample and the possession of the remainder did not occur 'at the same time, in the same place, and with the involvement of the same participants,' ... separate convictions and punishments for these two violations are appropriate." *Id.* at 457–58 (quoting *Palafox,* 764 F.2d at 563).

 We believe that this case is controlled by *Rodriguez-Ramirez* rather than by *Sanford, Palafox,* or *Ball* because proof of Wolf's possession was not limited to the time and place necessary to commit the act of transporting the stolen van in foreign commerce. Although Wolf asserts that "[n]o possession or treatment of the vehicle other than that which was necessary to transport it has been charged or proved," *Appellant's Reply Brief,* at 6, the fact is that over three days elapsed between the time the van was stolen in Coronado and the time Wolf was apprehended in Ensenada. Because the driving time from Coronado to Ensenada is only a couple of hours or so, Wolf's illegal possession of the van extended well beyond the time necessary to complete the offense of transporting the van in foreign commerce. Thus *Rodriguez-Ramirez* dictates that "separate convictions and punishments for these two violations are appropriate." 777 F.2d at 458.

The judgment of the district court is AFFIRMED.