# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2828

_____

| | |
|---|---|
| Johnny Lee Wilson, | * |
| | * |
| Plaintiff/Appellee, | * |
| | * |
| v. | * |
| | * |
| Lawrence County, MO; David | * |
| Tatum, Individually and in his | * |
| official capacity; Doug Seneker; | * |
| Bill Wegrzyn, Individually and | * |
| in his official capacity, | * |
| | *  Appeal from the United States |
| Defendants/Appellants, | *  District Court for the Western |
| | *  District of Missouri. |
| Bill Merritt, | * |
| | * |
| Defendant, | * |
| | * |
| Steve Kahre; Arthur Owens, | * |
| | * |
| Defendants/Appellants, | * |
| | * |
| John Does, 2-20, Individually and | * |
| in their official capacities, | * |
| | * |
| Defendants. | * |

_____

Submitted:  April 11, 2001

Filed: August 15, 2001

_____

Before BYE and BEAM, Circuit Judges, and MELLOY, District Judge.[1]

_____

BEAM, Circuit Judge.

Johnny Lee Wilson brought this 42 U.S.C. § 1983 civil rights action against Lawrence County and several law enforcement officials for allegedly violating his constitutional rights in conducting a murder investigation, which resulted in Wilson spending over nine years in jail for a crime he did not commit. The district court[2] denied appellants' motion for summary judgment asserting qualified immunity. We affirm.

## I.    BACKGROUND

On April 13, 1986, Cuba Pauline Martz was found murdered in her home in Aurora, Missouri. An intruder (or intruders) had apparently broken into her home, tied her up, beat her, and then started the house on fire with her inside. The next day, a major case squad composed of officers from several local law enforcement agencies was assembled to investigate the murder. Appellants are law enforcement officers who participated in the squad. The fruit of their investigation was a confession from Wilson, who is mentally retarded. In order to avoid the death penalty, Wilson entered an Alford plea, was convicted of the murder and spent over nine years in prison. In 1995, after conducting an independent investigation, the late Mel Carnahan, then Missouri Governor, granted Wilson a full pardon, stating: "As a result of an intense

---

[1]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa, sitting by designation.

[2]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

investigation conducted by my office, I have decided to issue a pardon to Johnny Lee Wilson because it is clear he did not commit the crime for which he has been incarcerated."[3]  Joint Appendix at 227.

In the days following the murder, officers interviewed Wilson twice.  During these initial interviews Wilson consistently stated that he knew nothing about the crime and had been shopping with his mother prior to the fatal fire.  Through their investigation, the appellants discovered that Wilson was twenty years old, still lived at home, worked occasional odd-jobs, was mentally impaired,[4] had attended mostly, if not exclusively, special education classes in high school and that some people believed he could be "talked into anything."

During this time, the officers began to focus on another local youth, Gary Wall, because he seemed to know early in the evening of April 13 that the victim had been tied and beaten.  This was before such information was made public.  Officers knew that Wall was a junior in high school, involved in special education classes, and was slightly mentally impaired.  They also knew that he had disciplinary problems at his school and had been described as a "very skilled liar" by school officials.  As a result of several custodial interrogations in the days following the murder, Wall told the officers on April 18 that Wilson had confessed to Wall that he committed the crime. That same day, Wall passed a polygraph examination regarding this issue.  Wilson challenges the efficacy of the polygraph test, based not only on the fact that Wall's statement proved to be false, but also on the insufficient amount of time allowed for the

---

[3]This case is before us for the second time.  On an earlier appeal we ruled that Wilson's pardon expunged his conviction and he could proceed with this section 1983 case.  Wilson v. Lawrence County, 154 F.3d 757 (8th Cir. 1998).

[4]Subsequent testing of Wilson indicates his overall mental abilities are in the bottom two percent of the population and that his adaptive behavior (communication, daily living skills, etc.) is in the lowest one percent of the general population.

numerous polygraph tests Wall was given on April 18, and the difficulty the examiner had in interpreting the tests.

Wall has since signed an affidavit asserting: he did not talk to Wilson at the scene of the fire or in the days following the crime and Wilson never confessed to him; the appellants first suggested Wilson's name to him as the criminal (not the other way around as the appellants contend); through leading questions, the appellants "tricked" him into giving details about the crime he did not know; the appellants threatened to put him in jail if he did not implicate Wilson in the crime and promised a reward if he did; and he did not come forward earlier to correct his statement because he was afraid of the police. The appellants contest Wall's account of the interrogations. The tapes of the interrogations, which were supposed to be in the appellants' possession, have inexplicably disappeared.

After extracting the statement from Wall, Deputy Seneker devised a plan to have Officer Owens pick up Wilson under the pretense of having him identify a lost wallet, and then question him about the murder. Owens found Wilson at a local movie theater and transported him to the police headquarters. Wilson was then taken to a windowless interrogation room. Appellants told him that he was not under arrest, but that department policy required them to read him his Miranda rights. Officers Kahre and Merritt interrogated Wilson for an hour. They played him portions of Wall's statement to convince him he had been implicated in the murder. During this time, Wilson denied any involvement and consistently repeated that he had been at the store with his mother prior to the fire.

Then, Deputy Seneker and Officer Wegrzyn took over the interrogation for approximately three more hours. Seneker falsely told Wilson that he knew what Wilson was thinking because he had a psychiatrist analyze him and that they had an eyewitness who could put him at the scene of the crime before the fire. They began to ask Wilson leading questions about the murder, strongly rebuking and threatening him when he gave answers inconsistent with the facts of the crime or was unable to give an

answer, and affirming him whenever his answers matched the details of the murder. Ultimately, a collection of discombobulated facts about the murder evolved into a confession. Wilson has stated that he only confessed because he was extremely scared, nervous, anxious, and was pressured to make a confession.

The record does not mention any independent physical or circumstantial evidence linking Wilson to the crime, or corroborating his confession. After Wilson's motion to suppress his confession was denied, he entered an <u>Alford</u> plea to avoid the death penalty and was convicted.

## II.    ANALYSIS

Wilson asserts four constitutional violations against the appellants: (1) that appellants violated his Fifth and Fourteenth Amendment rights by coercing a false confession from him; (2) that they violated his Fourth and Fourteenth Amendment rights by seizing him for a custodial interrogation without an arrest warrant or any probable cause to believe he had committed a felony; (3) that they violated his Fourteenth Amendment Due Process rights by coercing a false inculpatory statement from Wall and using this unreliable, manufactured evidence against him; and (4) that they violated his Fourteenth Amendment Due Process rights by recklessly or intentionally failing to pursue other leads in the investigation. The district court denied appellants' motion for summary judgment based on qualified immunity.

### A.    Jurisdiction Over Interlocutory Appeals

As an initial matter, we must determine whether we have jurisdiction over the appellants' claims in this interlocutory appeal. Denials of summary judgment based on qualified immunity are immediately appealable to the extent the appeal seeks review of the purely legal determinations made by the district court. <u>Johnson v. Jones</u>, 515 U.S. 304, 313 (1995); <u>see also</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 530 (1985) (mentioning that a district court's denial of qualified immunity was appealable "to the

extent that it turns on an issue of law"). However, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial," and we would thus have no jurisdiction over the appeal. Johnson, 515 U.S. at 319-20.

The appellants' arguments asserting qualified immunity rest largely on ignoring disputed facts in the record or asking this court to resolve factual disputes in their favor. For example, in asserting qualified immunity against Wilson's claim that they knowingly manufactured false evidence against him by coercing an inculpatory statement from Wall, appellants question the veracity of Wall's affidavit attesting to that fact. We do not have appellate jurisdiction to review the district court's finding that this affidavit, along with other evidence, created a genuine issue of fact for trial–whether officers did in fact manufacture false evidence by coercing Wall. We only have jurisdiction to review whether, given a certain set of facts, Wilson states a valid constitutional claim, and whether the claim was clearly established at the time the alleged violation occurred.

Although much of this appeal constitutes inappropriate attempts to challenge the district court's determinations that genuine issues of fact remain concerning the claims, appellants do raise several legal issues requiring further attention.

## B.    Qualified Immunity

"[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, officials are protected by qualified immunity so long as "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987).

In determining if appellants are entitled to qualified immunity we must ask whether Wilson states a violation of a constitutional right, and whether that right was clearly established at the time, such that a reasonable officer would have known that his conduct violated the law. Tlamka v. Serrell, 244 F.3d 628, 632 (8th Cir. 2001). To be clearly established, there need not be a case decided on all fours with the present factual circumstances. Vaughn v. Ruoff, 253 F.3d 1124, 1130 (8th Cir. 2001). Rather, it need only be apparent from pre-existing law that the conduct is unlawful. Anderson, 483 U.S. at 640.

At the summary judgment stage, we must view the facts in the light most favorable to Wilson, the nonmoving party below, and "take as true those facts asserted by [Wilson] that are properly supported in the record." Tlamka, 244 F.3d at 632. Therefore, although many of the facts recounted herein are contested by the appellants, we view them most favorably to Wilson.

### 1. Wilson's Confession

Wilson alleges the appellants violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment right to due process by coercing an involuntary false confession from him. Fundamental to our system of justice is the principle that a person's rights are violated if police coerce an involuntary confession from him, truthful or otherwise, through physical or psychological methods designed to overbear his will. See Blackburn v. Alabama, 361 U.S. 199, 206 (1960) ("coercion can be mental as well as physical . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition"). The Supreme Court has long held "that certain interrogation techniques, either in isolation or *as applied to the unique characteristics of a particular suspect*, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." Miller v. Fenton, 474 U.S. 104, 109 (1985) (emphasis added).

Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances–including an examination of both the conduct of the officers and the characteristics of the accused. Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir. 1983); see also Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). The Supreme Court has long indicated that one of the key concerns in judging whether confessions were involuntary, or the product of coercion, was the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne. See Colorado v. Connelly, 479 U.S. 157, 165 (1986) (stating that mental condition is surely relevant to an individual's susceptibility to police coercion); Spano v. New York, 360 U.S. 315, 321-22 (1959) (reversing conviction because confession was involuntary because of effect of psychological coercion on suspect who was foreign-born, completed one-half year of high school, and had a history of mental instability); Fikes v. Alabama, 352 U.S. 191, 196-98 (1957) (reversing a conviction because the coercion applied against a person who was "weak of will or mind" deprived him of due process of law); see also United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989) (stating that when judging the voluntariness of a confession one must consider the conduct of law enforcement officers and the ability of the suspect to resist coercion).

The appellants' own investigative reports reveal they were aware that although Wilson graduated from high school, he had attended largely, if not exclusively, special education classes; school officials considered him mentally handicapped; school officials believed he had difficulty distinguishing between fantasy and reality and believed he could be talked into anything. Armed with this knowledge, appellants proceeded to interrogate Wilson for over four hours. The district court described it thus:

> Four different officers interrogated Wilson; he was never left alone and no friend, family member, guardian or advisor was ever present. The officers lied to Wilson. They told him that there were eyewitnesses placing him at the scene prior to the time of the fire. They told him about Gary Wall's statement that Wilson had told Wall, before anyone else

knew, that Ms. Martz had been tied and burned in the fire. They offered to help Wilson obtain leniency if he confessed to the murder. They falsely informed him that their psychiatrist had analyzed him. They insisted that he would undoubtedly be found guilty if he did not confess. Then, when Wilson failed to provide correct details about the crime, they rebuked him for not cooperating and offered those details to him in a leading question format. Through the entire interrogation, Defendants used threatening tones and language. They restricted Wilson's freedom of movement and refused to accept his repeated protestations of innocence. They even threatened to use these protestations against him by claiming that his "lies" could subject him to even harsher penalties.

Wilson v. Lawrence County, No. 96-5026-CV-SW-1, slip op. at 24 (W.D. Mo. June 21, 2000).

Of particular concern, in addition to the general threats and intimidation that may have been employed to overbear Wilson's will, is the fact that the officers relied largely on leading questions to secure this confession from Wilson. Spano, 360 U.S. at 322 (noting that involuntary confession was not delivered in narrative fashion, but rather in response to "leading questions of a skillful prosecutor in a question and answer confession"); Fikes, 352 U.S. at 195 (describing involuntary confession that was delivered in response to yes-or-no questions, "some of which were quite leading or suggestive"). There are sufficient facts in the record to support the conclusion that the officers set out to secure a confession from Wilson, and succeeded only by overreaching. Against this background case law, in light of Wilson's limited intelligence and mental capacities, no officer could have reasonably thought this conduct consistent with Wilson's constitutional rights.

Appellants refer us to several cases that have held a confession is not involuntary simply because officials created a fear of imminent arrest, Jorgensen, 871 F.2d at 730, or expressed disbelief in the statements of a suspect in order to elicit further statements, United States v. Wolf, 813 F.2d 970, 975 (9th Cir. 1987), or lied to the accused about the evidence against him, Martin v. Wainwright, 770 F.2d 918, 925-27 (11th Cir.

-9-

1985), modified by, 781 F.2d 185 (11th Cir. 1986). However, none of the cases involve a confessor who was mentally handicapped. Also, a totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.

Lastly, appellants assert that one must take into account the fact that they repeatedly advised Wilson of his rights during the interrogation. They are correct that this is part of the totality of the circumstances and must be considered. See Evans v. Dowd, 932 F.2d 739, 742 (8th Cir. 1991). However, one must also consider that they downplayed the importance of those rights to Wilson, whom they knew was unlikely to understand them because of his low intelligence. Advising a suspect of his rights does not automatically mean that any subsequent confession is voluntary or that officers may use any methods to secure a confession, particularly when they know the suspect is unlikely to fully understand those rights. See Sims v. Georgia, 389 U.S. 404, 407 (1967) (holding that where suspect had only third grade education, was deprived of contact with anyone outside, and was subjected to earlier physical violence by officers, advising him of his right not to speak was of little significance); Fikes, 352 U.S. at 193 (stating that the fact an officer advised a suspect of his rights must be considered in light of suspect's experience and mental ability); see also Miller, 474 U.S. at 110 (stating that even after the Court ruled Miranda warnings must be given in custodial interrogations, the Court continued to judge whether confessions were voluntary under due process). Thus, the Miranda warnings are but one factor to consider in evaluating the totality of the circumstances.

We affirm the denial of qualified immunity on this claim.

## 2. Probable Cause to Arrest Wilson

Wilson claims he was arrested and held without probable cause when Owens picked him up at the movie theater and the appellants subsequently detained him at the station for questioning. Appellants rather cursorily assert that Wilson was not arrested because he was told he was free to leave; that if he was arrested there was probable cause to believe he committed the crime because police had the inculpatory statement from Wall; and that if there was not probable cause, then officers are entitled to qualified immunity. These arguments are only credible at this stage if we ignore the evidence that Wall's statement was coerced, the evidence relating to appellants' conduct at the station, and the evidence in their own records indicating Wilson was arrested when he arrived at the station. The district court found there were genuine disputes of material fact surrounding these issues, we therefore have no jurisdiction to review these claims.

We affirm the denial of qualified immunity for this claim.[5]

## 3. Interrogation of Gary Wall

Appellants argue that this claim is not cognizable because it is an attempt by Wilson to assert the constitutional rights of a third party.[6] The district court correctly

---

[5]The district court produced a memorandum and order, which thoroughly analyzed the legal and factual aspects of the various qualified immunity claims. Because appellants raise no actual legal objection to the district court's reasoning concerning whether Wilson alleged a cognizable constitutional violation or whether the rights involved were clearly established for this probable cause claim or the subsequent using false evidence claim, we feel it unnecessary to repeat the district court's legal analysis concerning those claims. See 8th Cir. R. 47(B).

[6]The case cited by appellants, Buckley v. Fitzsimmons, 20 F.3d 789 (7th Cir. 1994), is inapposite because the defendants were prosecutors who enjoyed absolute immunity for conduct at trial. The court there reasoned that since the violation, if any,

noted that this claim is not an attempt by Wilson to assert Wall's rights, but rather a claim that the appellants knowingly used false or unreliable evidence (the coerced statement from Wall) against Wilson at his criminal proceedings.  If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated.  See Napue v. Illinois, 360 U.S. 264, 269 (1959) (noting that this principle is implicit in any concept of ordered liberty); cf. Mooney v. Holohan, 294 U.S. 103, 112 (1935) (stating that due process is "a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured").   Appellants do not argue that this due process right was not clearly established.  Nor do they challenge the district court's finding that the right applied where the false statement was used at Wilson's probable cause and Alford plea hearings rather than at a trial.  We affirm the denial of qualified immunity on this issue.

### 4.    Failure to Investigate Other Leads

Negligent failure to investigate other leads or suspects does not violate due process.  See Daniels v. Williams, 474 U.S. 327, 334 (1986) (holding that protections of the Due Process Clause are not triggered by negligence); Baker v. McCollan, 443 U.S. 137, 144 (1979) (finding no cognizable constitutional claim where defendant's actions in detaining plaintiff for three days despite his protestations of innocence, without investigating those protests, amounted to no more than negligence).  Even allegations of gross negligence would not rise to the level of a constitutional violation.  Myers v. Morris, 810 F.2d 1437, 1468 (8th Cir. 1987) (stating that gross negligence

---

to the plaintiff occurred when the statements were introduced at trial the defendants were immune.  The court reasoned the only constitutional violation that occurred when the statements were actually coerced would have been one against the person making the statements.  The appellants in the present case receive no absolute immunity for using the allegedly coerced statements of Wall against Wilson at Wilson's criminal proceedings.

is generally not sufficient to state a procedural or substantive due process violation), overruled on other grounds, Burns v. Reed, 500 U.S. 478 (1991). The district court noted that only reckless or intentional failure to investigate other leads offends a defendant's due process rights. See Sanders v. English, 950 F.2d 1152, 1162 (5th Cir. 1992) (denying qualified immunity where evidence could support a finding that defendant had deliberately ignored exonerating information indicating he had arrested the wrong person); Whitley v. Seibel, 613 F.2d 682, 686 (7th Cir. 1980) (noting that while negligent acts in an investigation do not violate due process, intentional acts do).

Appellants concede that intentional acts of failing to investigate other leads would violate due process and they do not challenge the district court conclusion that this right was clearly established at the time of the alleged violation. However, they argue, citing Davidson v. Cannon, 474 U.S. 344 (1986), and Daniels, that allegations or evidence of recklessness are insufficient to state a claim and that Wilson has failed to state a claim by only producing evidence of negligence.[7] We address this latter argument first.

Wilson points to information concerning an escaped felon with a *modus operandi* matching this homicide and an eyewitness who saw someone outside of the house shortly before the fire (and who would have testified that the person she saw was not Wilson) as the leads the officers chose not to pursue. The district court held that, absent the evidence of coercion of Wilson's confession and Wall's statement, failure to investigate these additional leads would not support a claim of recklessness or deliberate intent and thus would not comprise a constitutional violation. However, the court reasoned "[i]f Wilson's allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder through reliable

---

[7]Contrary to appellants' assertions, Daniels specifically left unanswered the question of whether an official acting with some culpable state of mind more than negligence but less than intent was conscience shocking, and thus violated one's due process rights. 474 U.S. at 334 n.3.

but time consuming investigatory techniques designed to confirm their suspicions." Wilson, No. 96-5026-CV-SW-1, slip op. at 27. We agree. This leaves only the question of whether Wilson can state a due process violation by proving recklessness.

The general test of whether executive action denying a liberty interest[8] is egregious enough to violate due process is whether it shocks the conscience. County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). The Supreme Court has taken a context specific approach to determining whether intermediate culpable states of mind, such as recklessness, support a section 1983 claim by shocking the conscience and, thus, violating due process. Id. at 854 (holding, in context of high speed chase, officials violate substantive due process only if they act with an intent to harm); City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244-45 (1983) (finding deliberate indifference/recklessness to a pretrial detainee's serious medical needs violates due process); see also Arizona v. Youngblood, 488 U.S. 51, 57 (1988) (holding, in a non-1983 case, that failure to preserve evidentiary material that was not obviously exculpatory, only violates due process if done in bad faith); Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding, in a non-1983 case, that suppression by the prosecution of evidence favorable to the defendant material to either guilt or punishment violates due process regardless of good faith or bad faith by the prosecution).

In Neal v. St. Louis County Board of Police Commissioners, 217 F.3d 955, 958 (8th Cir. 2000), we stated, based on Lewis, that in situations where state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct,

---

[8]It almost goes without saying that the liberty interest involved here is the interest in obtaining fair criminal proceedings before being denied one's liberty in the most traditional sense. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that suppression by the prosecution of evidence favorable to the defendant material to either guilt or punishment violates due process); Napue, 360 U.S. at 269 (holding that the use of false evidence against a criminal defendant violates due process and this principle is inherent in any concept of ordered liberty). "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." Brady, 373 U.S. at 87.

such action violates due process if it is done recklessly.[9] Id. This statement from Neal certainly applies to the present claim.

In deciding to apply the intent standard for due process violations in high-speed chases in Lewis, the Court noted that "[t]o recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations."[10] 523 U.S. at 853. Thus, only an intent to harm in the context of high-speed chases rises to the level of a constitutional violation. Id. at 854. In the present situation, officers conducting the post-arrest investigation certainly had the luxury of unhurried judgments and repeated reflections, which make a reckless standard appropriate. The preliminary hearing in Wilson's case did not occur until October 1, 1986–five and one-half months after appellants secured his involuntary confession.

---

[9]It is important to recall that this reckless standard normally contains a subjective component similar to criminal recklessness. For example, in the Eighth Amendment context, from which the standard is borrowed, prison officials must actually be aware of a prisoner's serious medical need or other risks to the prisoner's well-being for there to be a constitutional violation. Farmer v. Brennan, 511 U.S. 825, 837 (1994); Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000). The district court's characterization of the facts demonstrates a proper application of this subjective recklessness standard.

[10]In Lewis, the Court relied heavily on its previous analysis in prison cases under the Eighth Amendment. The Court analogized a high-speed chase to a prison riot situation, which it had found demanded a higher level of culpability than just recklessness. Whitley v. Albers, 475 U.S. 312 (1986). In doing so, it distinguished Lewis from those cases where recklessness was found sufficient to state a claim in prison conditions and medical needs cases under the Eighth Amendment, Farmer, 511 U.S. at 837; Estelle v. Gamble, 429 U.S. 97, 104 (1976). This standard was applied to pre-trial detainees under due process because the Court thought it would be remarkable if convicted prisoners had more rights under the Eighth Amendment than a pre-trial detainee had under due process. City of Revere, 463 U.S. 239.

Law enforcement officers, like prosecutors, have a responsibility to criminal defendants to conduct their investigations and prosecutions fairly as illustrated by the Brady line of cases requiring the state to disclose exculpatory evidence to the defense. Although charged with investigating and prosecuting the accused with "earnestness and vigor," officers must be faithful to the overriding interest that "justice shall be done." United States v. Agurs, 427 U.S. 97, 110-11 (1976), overruled on other grounds, United States v. Bagley, 473 U.S. 667 (1985)[11]; see also Youngblood, 488 U.S. at 54-55 (evaluating whether Brady applied where officers, rather than prosecutors, lost evidence). They are "'the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.'" Agurs, 427 U.S. at 111 (quoting Berger v. United States, 295 U.S. 78, 88 (1935). There is no countervailing equally important governmental interest that would excuse the appellants from fulfilling their responsibility to investigate these leads when faced with an involuntary confession and no reliable corroborating evidence. Therefore, the proper standard to judge whether the officers' conduct violates due process is recklessness.

If Wilson's evidence proves credible at trial, a failure to investigate these other leads could easily be described as reckless or intentional. We affirm the denial of qualified immunity.

## III.  CONCLUSION

Accordingly, we affirm the district court. The case is remanded for further proceedings consistent with this opinion.

---

[11]Although Bagley overruled a different aspect of Agurs, it reaffirmed the notion that a prosecutor's overriding responsibility is that justice shall be done. 473 U.S. at 675 n.6.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.