OPINION
{¶ 1} Tyrone Knight appeals from his convictions in the Clark County Common Pleas Court of aggravated arson and murder. In his first appeal, Knight's appointed *Page 2 
counsel could find no arguable merit to Knight's appeal. We, however, discovered an arguable issue and that was whether Knight's confession to police was voluntarily made. We permitted Knight's appointed counsel to withdraw and we appointed new counsel to address this issue and any other counsel wished to pursue on Knight's behalf.
 {¶ 2} On February 15, 2002, Knight was involved in a heated argument with Anthony Harris at the Striver's Club in Springfield. A fight ensued between Harris and Knight and John Carson joined the fray to assist Harris. Knight left the scene in his girlfriend's car and later drove past Carson's home. Harris and Carson threw objects at the car as it passed. Early the next morning, Knight threw a firebomb at Carson's home. The home caught fire and fourteen-year-old Olajuwon "Bear" Carson died in the fire.
 {¶ 3} Three days later, Springfield Police were contacted by Knight's mother because police had informed her that the Carsons were "casing" her house and that she and her son were in danger. She assured police that her son had denied responsibility for the fire. Officer James Hall arranged to pick up Knight and his mother to bring them to the police station for questioning. Knight subsequently confessed to throwing a Molotov Cocktail into the Carson home after being questioned by the police but denied intending to kill anyone.
 {¶ 4} Knight was then charged and later indicted for two counts of aggravated arson and aggravated murder and twelve counts of attempted murder. Prior to trial, Knight moved to suppress the confession he gave to the police, which was overruled by the trial court. A jury subsequently convicted Knight of aggravated arson and murder. He was sentenced to a mandatory term of fifteen years to life and a five-year term on the aggravated arson conviction. The court ordered the terms be served consecutively *Page 3 
after considering the factors listed in R.C. 2929.14.
 {¶ 5} In his first assignment, Appellant contends the trial court erred in finding that his statements to the police were voluntarily, knowingly and intelligently made. Knight contends the police coerced his confession by promising him leniency and in ignoring his request for counsel.
 {¶ 6} We have reviewed the videotape of Knight's interrogation by the police and the transcript of that videotape. Knight told Detective Darwin Hicks at the outset that he was willing to talk to the police about the allegations he firebombed the Carson home. (Tr. 1, Defense Ex. A.) Knight then explained at length the altercation which occurred at Striver's Club. (Tr. 2-4, Defense Ex. A.) Knight told Detective Douglas Estep that everybody on the street were saying he was responsible for the fire, but he "wouldn't do that." (Tr. 13, Defense Ex. A.)
 {¶ 7} The following exchange then occurred between Detective Barry Eggers and the defendant:
 {¶ 8} "Eggers: You've got problems, okay. And I heard that you were gonna come down here to talk to us. I thought it was because you were gonna set the record straight. And I've been listening to what's going on in here and basically you're strapping yourself in the chair.
 {¶ 9} "A: Well, can I talk to my lawyer then if there is something wrong like that? Do I need one or something?
 {¶ 10} "Eggers: Everything you're telling us is basically sort of true except for you talking about you didn't have no beef with anybody and everybody at that bar says that you were, you were in a fighting mood. And you're in here trying to make us believe *Page 4 
that you were just happy-go-lucky.
 {¶ 11} "A: I mean I'm not saying I was happy-go-lucky, but I don't remember me knocking anybody's drink off the table. If I did I'd have bought them another. If I did, I probably bumped it off the table by walking by or something like that. But I wasn't knocking nobody's beer —
 {¶ 12} "Eggers: Here's the thing, you need to think about this. We know you never intended to kill nobody, but you come in here with this story that I wasn't there and not showing any remorse for what happened.
 {¶ 13} "A: I'm not saying, I'm not saying that I'm not-that I don't feel bad about what happened to the — I know what happened.
 {¶ 14} "Eggers: Well, you know, like I'm saying, we know you didn't mean to kill nobody. You have got to get his-you have got to set the record straight. Our evidence, we've been working this since it happened and our evidence clearly shows that you are the person responsible for this fire. But in my mind I don't think that you meant to kill anybody. But the only way you're gonna convince us of that is if you come in here and tell us the truth. And you coming here with this story is not gonna cut it. Nothing you have said matches up to what anybody else says so that makes you out a liar.
 {¶ 15} "A: I'm not trying to lie to you officer.
 {¶ 16} "Eggers: What I'm telling you is you need to set the record straight with these guys and show some remorse for what happened to this little boy.
 {¶ 17} "A: Officer, I do, believe me I do feel remorse for this guy, this little boy. *Page 5 
 {¶ 18} "Eggers: I believe you, I believe you, but I also believe that you are the one responsible for that fire. Like I said all the evidence shows that you are that person. Everybody on the street knows it's you. Everybody.
 {¶ 19} "A: And they saying that I did it-
 {¶ 20} "Eggers: That's because it's true, and you know it's true. And you sitting here with this story that I didn't do it, I didn't do it, is gonna get you aggravated murder. We've been doing this for a long time. We did our homework.
 {¶ 21} "A: May I find representation?
 {¶ 22} "Eggers: Do what?
 {¶ 23} "A: If I need representation, I'll find that?
 {¶ 24} "Eggers: What do you mean?
 {¶ 25} "A: By a counselor or something.
 {¶ 26} "Eggers: Is that what you are saying that you need an attorney?
 {¶ 27} "A: I don't know.
 {¶ 28} "Eggers: Well only you can say. What I'm telling you is the evidence clearly shows you are the person responsible for this and when I heard you wanted to come in here, I thought you were coming here to set the record straight. I thought that was what it was about. Because like I said, nobody in here believes that you meant for anybody to die.
 {¶ 29} "Estep: This is the only chance you're gonna get to tell us what happened out there. This is the only chance you're gonna get. And like he said, this is the time to tell the truth. This is the time to tell us what happened so we know in our minds what went on out there, instead of what a lot of other people are telling us. And *Page 6 
we've got some stuff that we haven't told you yet, we just want to see what you were gonna say. That's why he stepped in here, because we knew the direction we thought you were gonna go but you didn't go there. We know what-we know what happened out there is more than you think we know. And that's why we've been looking for you. That's why I wanted you to come down here.
 {¶ 30} "Eggers: And there is no reason for all these people at the bar to lie on you, none.
 {¶ 31} "Estep: You did the right thing by coming down here today on your own. We didn't have to go out and find you, you come down here, so that-you're on the right foot here but you're just-you stopped short of everything.
 {¶ 32} "A: So what is it that-just ask me.
 {¶ 33} "Eggers: All I want you to do is set the record straight and like I said, the only way you're gonna convince the prosecutor that you're sorry for what happened is to tell the truth or he's gonna charge you with aggravated murder and try to put you in the chair. But like I said, I don't believe and Doug does not believe that when this happened that you felt anybody would ever die over it. And that makes a difference. But what makes a bigger problem for you is for you to come in here and try to say aw, I had a beef with these guys but hey I was okay with it. That's not Tyrone. That is not Tyrone Knight and you know it. Everybody in that bar knows what you're about and it's not what you just came in here and described.
 {¶ 34} "A: I never had a beef with John.
 {¶ 35} "Eggers: I'm not saying you did, you had a beef with Anthony and John got in it. And you're not used to taking an ass whipping. *Page 7 
 {¶ 36} "A: Oh, I didn't feel I did, but I'm not-that's beside the point.
 {¶ 37} "Eggers: You're not used to getting an ass whipping and you took one this night and it pissed you off. It made you furious, and I can understand that. Because that's not what Tyrone is used to. We've talked to everybody about you man. Tyrone doesn't take an ass whipping and just let it go. You have got to set the record straight here. Cause like I said I know you didn't mean for this little boy to die. But if you come in here and continue this story about how you went to Columbus. I'm telling you I got you on tape. (Inaudible)
 {¶ 38} "A: I did go to Columbus though.
 {¶ 39} "Eggers: I know you did. I know you did. You've got to set the record straight here. I thought that's why you were coming here. You know the story about you not knowing who this other guy was, come on, we know who it was. We know who the other guy is, we've talked to him. We're not gonna tell you everything we know unless we go to the box. When we go to the box, that's when you'll find out what we got. But then I'm afraid it's gonna be too late for you. Then it's gonna be-
 {¶ 40} "Estep: We also want to know who else was involved with doing this Tyrone. I mean I threw some names out there and there is a reason why I threw those out there.
 {¶ 41} "Eggers: I can look at you and I can tell this is eating you up because deep down inside you got some morals about you. I know you feel bad about this and it's gonna eat you up until you let it go. I've been lied to by the best of them and I know you're not a sociopath.
 {¶ 42} "A: Can I ask you for something? *Page 8 
 {¶ 43} "Eggers: Sure.
 {¶ 44} "A: Can we take a break?
 {¶ 45} "Eggers: Absolutely.
 {¶ 46} "A: Somebody staying with me so I can go outside with my mother and we all just stand outside.
 {¶ 47} "Eggers: Sure. Listen to me Tyrone-
 {¶ 48} "A: That's all I want.
 {¶ 49} "Eggers: Nobody is telling you, you're under arrest. You're free to go anywhere you want, okay. But you need to understand, we did our homework and this is your opportunity tonight to let us know what was going on in your head when this happened, okay. Cause the only one that knows is you, all right. You want to talk to your mom. What do you want to do. Like I told you, we know you never intended for anybody to die. But the only way we're gonna know that for sure is if you tell us what was going on. I know you were furious, you were upset. You took an ass beating. I mean you can come here and make it sound like it wasn't much but listen to me man. They told me, Fee told us they beat you down and they chased you down the street and that pissed you off and then you called later and said this ain't over. And when you told her this ain't over, she believed it because you were furious.
 {¶ 50} "A: To tell you the truth, I don't remember calling her and telling her that it wasn't over, but just-
 {¶ 51} "Eggers: We got the phone records, you called her eight times-
 {¶ 52} "A: Did I?
 {¶ 53} "Eggers: Over an hour period. Most of those times, she hung up on *Page 9 
you and that made you even more furious.
 {¶ 54} "A: Will you please just tell me that, what time was the last call?
 {¶ 55} Eggers: I'd have to have the records right here in front of me. I don't want to sit here and lie to you.
 {¶ 56} "A: So us-
 {¶ 57} "Estep: Just tell us what happened, Tyrone, I mean that's the only thing that's gonna help anything here. I mean we're not here to you know-
 {¶ 58} "Eggers: We're not here to judge you, we're not here to strap you in the chair. We're here to get the facts and your story does not jive in any of this, okay. The only thing your story is doing is making you look like a cold-blooded killer.
 {¶ 59} "A: No, I am not.
 {¶ 60} "Eggers: And I know you're not.
 {¶ 61} "Estep: You came down here on your own and if you know what happened I figured you'd tell us and then-it makes you-you know you can't believe how much that's gonna help you.
 {¶ 62} "A: Can we take a break?
 {¶ 63} "Eggers: Sure, yeah, anything you want.
 {¶ 64} "A: I'm not going nowhere.
 {¶ 65} "Eggers: And I believe you.
 {¶ 66} "A: We staying here.
 {¶ 67} "Eggers: You know, you know you've got to get this off your chest.
 {¶ 68} "A: We staying here. Just let an officer come out with me.
 {¶ 69} "Eggers: Is this because you want to smoke? I mean if you want to *Page 10 
smoke, I'll let you smoke right here.
 {¶ 70} "A: I —
 {¶ 71} "Eggers: But if you want to go out, you can do that too.
 {¶ 72} "A: I want to smell the air, smell the air.
 {¶ 73} "Eggers: But you know we've got to get this straight.
 {¶ 74} "A: It's gonna get straight. I'm gonna tell you the honest to God.
 {¶ 75} "Estep: We'll appreciate that.
 {¶ 76} "Eggers: Because like I said, we're gonna show where everything you've said so far is not accurate, okay. So what I'm gonna do is we're gonna go over this again.
 {¶ 77} "A: Can you tear that up.
 {¶ 78} "Estep: I can't tear it up.
 {¶ 79} "Eggers: Well, we can't tear it up, but I mean if it's not accurate then we-all you've got to is tell us it ain't accurate.
 {¶ 80} "Eggers: Okay, before you are asked any questions you must understand your rights,
 {¶ 81} "1. You have a right to remain silent, anything you say can be used against you in court.
 {¶ 82} "2. You have a right to talk to a lawyer for advice before we ask any questions and to have him with you during questioning.
 {¶ 83} "3. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you wish. *Page 11 
 {¶ 84} "4. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time.
 {¶ 85} "5. You also have the right to stop answering at any time until you talk to a lawyer.
 {¶ 86} "Eggers: You understand you're not under arrest, right?
 {¶ 87} "A: Yeah.
 {¶ 88} "Eggers: You understand you don't have to talk to us, correct?
 {¶ 89} "A: Right.
 {¶ 90} "Eggers: Okay, It says: I have read this statement of my rights or I have been informed orally of my rights and I understand what my rights are. I'm willing to make a statement and answer questions at this time without the services of a lawyer. I understand and know what I am doing. No promises no threats have been made to me. No pressure or coercion of any kind has been used against me. Now I understand you didn't want to sign this before and that's perfectly okay. But the only thing this says by signing it is that you understand what it says. It doesn't say you're admitting to anything. So I mean if you still don't want to sign it that's fine. I guess it's up to you. Okay, and I'm really not concerned whether you sign it or not.
 {¶ 91} "A: I'm not, I'm not. I'm signing but I'm just thinking —
 {¶ 92} "Eggers: The only thing you are saying by signing is that yeah, it's been read to me and I understand it. That's all the signature means.
 {¶ 93} "Eggers: It's 1135 hours and Tyrone went outside and pulled himself together and we're gonna continue from here. I guess at this point we might as well let you tell us what happened there." *Page 12 
 {¶ 94} Knight then admitted to Detective Eggers that he threw the firebomb at the Carson home. (Tr. 30-32 Defense Ex. A.) He told Eggers he didn't mean for the boy to die. Then the following colloquy occurred between Eggers and the defendant:
 {¶ 95} "Eggers: Well if it means anything, we don't think that he even knew the house was on fire. It not like he was trapped and-it looks like he probably slept all the way through it.
 {¶ 96} "A: So I know that she probably all gonna be tripped out but-how I said, it's a life for a life, take mine.
 {¶ 97} "Eggers: Well, and that's not for us to decide. Only God can judge you.
 {¶ 98} "A: I'm just saying, I did what I had to do, I asked him, I asked him to give me the strength to make it right. I said if you give me a test and make it right, just give me a chance to make it right and I'll make it right. But I didn't know what-I didn't know what I was gonna tell you when I came in here. I didn't know if I was supposed to get a lawyer before I came here. I didn't know if I was to sign anything before I came in or when I was in here. I didn't know what to do, so I'm only doing what I can do-like you said, make it right. I — before Friday and I was gonna be in here before Friday. I was coming before Friday.
 {¶ 99} "Eggers: Well it takes a big man to come in here and tell on himself.
 {¶ 100} "A: I was on my way.
 {¶ 101} "Eggers: And what I said when I heard you were coming in here from talking to you last time, I thought you were coming in here to make this right. And that's why it kind of surprised me that you came in here and was telling that story, *Page 13 
but we got around that.
 {¶ 102} "A Well I didn't like, I just didn't tell the whole truth.
 {¶ 103} "Eggers: Do you want some time with mom.
 {¶ 104} "A: It's over with."
 {¶ 105} Knight's mother, Danita Knight, testified her son was twenty-three years old at the time of the interview. She testified that Detective Eggers called and told her that their lives were in danger because the Carsons were casing their house, and that it would be best that she and her son come down to the police station. (Tr. 72, Suppression Hearing.) She testified she knew that Tyrone was alleged to have started the fire and she suggested that he go to the police and explain what happened at the Carson house. (Tr. 81, Suppression Hearing.)
 {¶ 106} Knight did not testify at the suppression hearing, but his counsel presented a transcript of the videotape interview in his defense. At his sentencing, it was determined Knight had a prior record and prior experience with the police.
 {¶ 107} The State must prove by a preponderance of the evidence that a defendant's confession is voluntary. Lego v. Twomey, 404 U.S. 477,92 S.Ct. 619 (1972). In making that determination, a court should consider the totality of the circumstances. State v. Basher (1978),53 Ohio St.2d 135. A suspect's decision to waive his privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. State v. Otte,74 Ohio St.3d 555, 1996-Ohio-108.
 {¶ 108} In State v. Brown, 100 Ohio St.3d 51, 55, 2003-Ohio-5059, cert. denied, 124 S.Ct. 1516 (2004), the Ohio Supreme Court elaborated on the test for *Page 14 
voluntariness:
 {¶ 109} "In determining whether a pretrial statement is involuntary, a court `should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'"
 {¶ 110} Appellant was 23 years of age at the time he made his confession to the police. The videotape indicates Knight was an intelligent young man. Knight was not under arrest when he gave his statement to the police and although the police were not required to give Knight the Miranda warning, they did so before questioning him and later again during the interrogation. Danita Knight suggested her son talk to the police and he expressed a willingness to do so. (Def. Ex. A at 1.) The questioning occurred over a two-hour period, but the police permitted Knight an opportunity to take small breaks. Knight was informed by Detective Eggers that he was not under arrest and that he was free "to go anywhere you want." (Def. Ex. A at 25.) Detective Eggers told Knight that he wasn't being truthful with him and he was "strapping [himself] in the chair." (Def. Ex. A at 23.) Eggers informed Knight that the police had evidence that he was responsible for the fire but he believed Knight did not intend to kill anybody. (Def. Ex. A at 23.) Eggers told Knight that it was time to tell the truth. Eggers told Knight to tell the truth or the prosecutor would charge him with aggravated murder and try to put him in the chair. (Def. Ex. A at 24.) After Knight admitted setting the fire, he told Detective Eggers that he had asked God to give him the strength to make it right and he intended to come to the police before he eventually did. (Def. Ex. A at 44.) *Page 15 
 {¶ 111} In State v. Cooey (1989), 46 Ohio St.3d 20, 28, the Ohio Supreme Court stated that admonitions to tell the truth directed at a suspect by police officers are not coercive in nature. Cooey claimed that a police officer "threatened" him by warning him that if he had lied, he had "buried" himself. The court held these were neither threats nor promises, but permissible admonitions to tell the truth. See also,State v. Wiles (1991), 59 Ohio St.3d 71. Police assertions that the suspect had theretofore been lying or would have no later chance to tell his side of the story do not automatically render a confession involuntary. United States v. Gamy (9th Cir. 2002), 301 F.3d 1138; United States v. Wolf (9th Cir. 1987), 813 F.2d 970 .
 {¶ 112} The California Supreme Court has held that while the fact a statement was obtained despite the defendant's invocation of the right to counsel is one of the circumstances bearing on the voluntariness of a defendant's statement, it is not dispositive. People v. Bradford (1997),14 Cal.4th 1005, 1041; 929 P.2d 544. Recently the same court held a defendant's statement voluntary despite his repeated invocations of his right to counsel. People v. Jablonski (2006), 37 Cal.4th 774,126 P.3d 938. It is reasonably clear that a request for counsel by the accused who is not in police custody is but one factor to consider in determining whether his statement is voluntary. In this case, Knight, at best, made two equivocal requests for counsel. When asked by Detective Eggers whether Knight was saying he needed an attorney, Knight replied he didn't know.
 {¶ 113} Coercive police activity is a necessary predicate to finding that a confession is not voluntary. In this case, it is significant that Knight's mother suggested he go to the police and explain his involvement in the fire. It is also significant that *Page 16 
Knight admitted he wanted to make things right and had intended to come speak to the police before the police called his mother. Any pressure Knight felt from his own conscience to square things with his victim was not the result of police coercion. Colorado v. Connelly (1986),479 U.S. 157, 107 S.Ct. 515. We are satisfied that the State proved that Knight's confession was a voluntary one. There is no indication that Knight's will was overborne or that his capacity for self-determination was critically impaired because of police coercive conduct. State v.Otte, supra. The Appellant's first assignment of error is Overruled.
 {¶ 114} In his second assignment, Knight contends the trial court erred in sentencing him to consecutive sentences after making certain statutory findings without the intervention of a jury. Knight, however, did not object to the procedure followed by the trial court and he has thus forfeited an appeal on the Foster issue. State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642. The second assignment of error is also Overruled.
 {¶ 115} The Judgment of the trial court is Affirmed.
FAIN, J., concurs.