[Cite as *State v. Harris*, 2019-Ohio-2939.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28145 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-2987 |
| | : | |
| JEREMY R. HARRIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 19th day of July, 2019.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
       Attorney for Plaintiff-Appellee

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P.O. Box 137, Germantown, Ohio 45327
       Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

**{¶ 1}** In this case, Defendant-Appellant, Jeremy Harris, appeals from his conviction and sentence, which followed his no-contest plea to a 12-count indictment. After merging some of the offenses, the trial court sentenced Harris to a total of 38 years to life in prison for convictions of murder (proximate result), with a firearm specification; aggravated robbery (deadly weapon); two counts of tampering with evidence (alter/destroy); and having weapons under disability.

**{¶ 2}** In a single assignment of error, Harris contends that the trial court erred in overruling his motion to suppress evidence. For the reasons stated below, we find no error and affirm the trial court's judgment.

I.  Facts and Course of Proceedings

**{¶ 3}** Harris's conviction and sentence arose from the shooting death of Antonio Perkins on or around September 21, 2017. On that date, Perkins's body was found outdoors in an alley located at 33 Five Oaks Avenue in Dayton, Ohio. Dayton Police Officer Gregory Mills was dispatched to the scene at around 10:37 a.m. When Mills arrived, he found that Perkins was dead, with a gunshot wound to the head.

**{¶ 4}** After learning that Perkins owned a cell phone that was not on his person, the police were able to identify Harris as a suspect by using "ping" technology. On the same day, Harris had also been identified as the suspect in an assault complaint, and the Dayton Police had initiated a broadcast to arrest Harris for that complaint. The police then arrested Harris at his workplace on September 21, 2017, and brought him in for questioning.

**{¶ 5}** Dayton Police Officer Jordan Alexander transported Harris to the Safety

Building. Harris did not make any statements while being transported. However, when the holding room was being searched to make sure it was safe, Alexander stood next to Harris. At that time, Harris was talking to himself. Harris looked down and "said he knew why he was there[,] that he was going to be charged with murder." Transcript ("Tr."), p. 47.

{¶ 6} At around 4:30 p.m. on September 21, 2017, David House, a Dayton Police Department ("DPD") homicide detective, questioned Harris. Detective Kevin Phillips was also present. Initially, House administered *Miranda* warnings to Harris, and Harris signed a written waiver of his rights. During questioning, Harris claimed that he lived with his mother, and said that certain items (a varsity-style jacket and a BB gun) would be located at his mother's house. According to Harris, he only possessed a BB gun and did not have a semi-automatic weapon like the one witnesses had seen him carrying the night of the murder.[1]

{¶ 7} During the interview, Harris gave conflicting accounts of what he had done the previous evening, but eventually did admit that he had taken a cell phone from Perkins's pocket. Harris claimed that he saw Perkins's body while walking through the alley, and saw the cell phone in Perkins's pocket. Again, Harris denied having a gun, other than the BB gun. He also denied any involvement with the murder.

{¶ 8} The police went to the house where Harris's mother lived, and she consented to a search of her home. However, the police did not find either the jacket or a BB gun.

---

[1] The record does not indicate the precise time of the murder. However, the pinged calls associated with Harris occurred at a few minutes after midnight. Thus, the murder could have occurred close to midnight on September 20, 2017, or shortly thereafter, on September 21, 2017. When Harris was arrested and searched, the victim's cell phone was in his possession.

In talking with Harris's mother, the police learned that Harris had an apartment located on Catalpa Drive, in Dayton, Ohio. After obtaining a search warrant for the Catalpa apartment, the police found the varsity jacket (which Harris was wearing the night of the incident), a broken cell phone, and Harris's wallet (with his identification), inside a camouflage backpack. They also found a 9mm semi-automatic pistol with ammunition under the mattress in Harris's bedroom.

{¶ 9} On September 23, 2017, the police interviewed Harris a second time. Det. House again administered *Miranda* warnings and obtained a written waiver from Harris. During this interview, House informed Harris of what the police had found during their search. Harris made incriminating statements during this interview. He admitted shooting Perkins in the alley where the body was found. His story, essentially, was that he and an acquaintance approached Perkins and asked for a cigarette. However, Perkins sprayed them with mace, and during an altercation, a gun fell out of Perkins's pocket. Harris stated that he then shot Perkins while Perkins was running away.

{¶ 10} After the second interview, the police obtained another search warrant for Harris's apartment and conducted a search on September 26, 2017. At that time, they found and seized a small can of mace that was adjacent to where the jacket and weapon had been found. They also seized a pair of black tennis shoes (Harris had told police that he was wearing a pair of black tennis shoes the night of the murder).

{¶ 11} Subsequently, in early October 2017, the State filed a 12-count indictment charging Harris with five counts of murder, all with three-year firearm specifications; two counts of felonious assault, with three-year firearm specifications; two counts of aggravated robbery, with three-year firearm specifications; two counts of tampering with

evidence; and one count of having weapons under disability. Harris first pled not guilty; he later also pled not guilty by reason of insanity and requested a competency evaluation. After considering the content of a psychiatric report submitted by the Forensic Psychiatry Center for Western Ohio, the trial court filed an order in March 2018, finding Harris competent to stand trial.

{¶ 12} In April 2018, Harris filed a motion to suppress statements he made to the police, based on alleged denial of his right to speak with counsel or have counsel present. Harris also asked the court to suppress evidence found in the search of his apartment. On April 28, 2018, the trial court held a suppression hearing, during which the State presented evidence from DPD Detectives Geiger, Cope, and House, and from Officer Alexander, a DPD patrol officer. After considering the evidence, the trial court overruled the motion to suppress.

{¶ 13} Just before his jury trial was set to proceed, Harris pled no contest to all the charges as indicted, for purposes of appealing the court's prior suppression ruling. Tr. at p. 114. Following the plea, the court found Harris guilty as charged and sentenced him as noted above. Harris now appeals from his conviction and sentence.

## II.  Suppression of Evidence

{¶ 14} Harris's sole assignment of error states that:

> The Trial Court Erred When It Denied Defendant's Motion to Suppress Evidence.

{¶ 15} According to Harris, the trial court erred in failing to suppress his statements to police, because he made multiple requests for counsel during his interviews. In ruling

on the motion to suppress, the trial court found the testimony of the detectives and police officers credible.   It further stated:

> On two occasions, Detective David House interviewed defendant at the Safety Building.   On each occasion, Det. House provided a Miranda advisement to defendant using a written pre-interview rights advisement form.   The interviews were recorded and the court has fully viewed each taped interview. Defendant waived his rights and answered questions. Defendant appeared coherent, understanding his rights and his environment.

> On multiple occasions, defendant asks questions or makes oblique references about his right to counsel.   However, defendant's assertion of his right to counsel, sufficient to require termination of the interrogation, must be clear, unambiguous, and unequivocal. * * * The court agrees with the State's analysis (State's Memo. in Opp. To defendant's Motion to Suppress (filed 5/1/18), pp. 11-18) that the defendant's various mentions of an attorney, in the context of those particular points in the interview (excepting defendant's one unequivocal and direct invocation of the right to counsel which the detectives honored), were unclear and ambiguous. Detective House answered defendant's many questions without misleading defendant or providing inaccurate information to him.

Doc. #59, Decision, Order and Entry Denying Defendant's Motion to Suppress Evidence, pp. 1-2.

{¶ 16} When a trial court rules on a motion to suppress, it "assumes the role of the

trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). As a result, when we review suppression decisions, we must "accept the trial court's findings of fact if they are supported by competent, credible evidence." *Id.* "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

**{¶ 17}** After reviewing the record, including the transcript of the suppression hearing and both videos of the interviews, we conclude that the trial court's factual conclusions are supported by competent, credible evidence and meet applicable legal standards.

**{¶ 18}** To "protect the Fifth Amendment privilege against self-incrimination," *Miranda* requires police to use certain procedures in dealing with accused persons. *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Among other things, before initiating questioning, the police must inform suspects of their right to remain silent and to have counsel present, if the suspect wishes. *Id.*, citing *Miranda* at 468-470.

**{¶ 19}** The police must "scrupulously honor the defendant's exercise of his right to cut off questioning." *State v. Murphy*, 91 Ohio St.3d 516, 519, 747 N.E.2d 765 (2001), citing *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *Miranda* at 479. However, "police must honor an invocation of the right to cut off questioning only if it is *unambiguous*." (Emphasis sic.) *Id.*, citing *Davis v. United States*,

512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

{¶ 20} Whether an accused has "*actually invoked* his right to counsel" involves "an objective inquiry." (Emphasis sic.) *Davis* at 458-459. The United States Supreme Court has stressed that its precedent does not require cessation "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." (Emphasis sic.) *Id.* at 459. In addition, the police need not "ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), citing *Davis* at 461-462. A defendant's words must also be examined "not in isolation but in context." *Murphy* at 520-521.

{¶ 21} As noted, Harris mentioned attorneys multiple times during his interviews. We will discuss each instance.

### A. The First Interview

#### i. Comments Prior to the Reading of *Miranda* Rights

{¶ 22} During the suppression hearing, Det. House explained in detail the procedures he used to inform Harris of his Fifth Amendment rights. Initially, House asked Harris for general information such as his name and address, and also asked if Harris's *Miranda* rights had been read to him previously. Harris said that these rights had not previously been read to him. This, in fact, was false, as another officer had specifically noted in a report that he read Harris his rights in 2009 using Dayton Police Department Form 300. This is the same form House was using. House also specifically

told Harris that he was going to question him about the crime of homicide, and Harris stated that he understood what homicide meant, i.e., that someone had been killed.

{¶ 23} While House was getting ready to read the *Miranda* rights to Harris, Harris asked, "Why can't I have a lawyer talking to me while I'm here?   State's Ex. 3 (Sept. 21, 2017 Video), 16:61:55; Tr. at p. 70.   At that point, House responded, "Well, we're going to go over that with you.   That's what we're going to discuss." *Id.*   Harris then commented that House could have told him that before beginning to question him; in response, House stressed that he was not yet questioning Harris.   *Id.*

{¶ 24} House's statement was literally true.   At that point, he was simply preparing to read the *Miranda* rights to Harris.   We agree with the trial court that Harris's statement was ambiguous, and that an objective officer would not have understood it as a clear invocation of the right to counsel.   *E.g.*, *State v. Knight*, 2d Dist. Clark No. 04-CA-35, 2008-Ohio-4926, ¶ 9, 112 (statements that " 'Well, can I talk to my lawyer then if there is something wrong like that?   Do I need one or something?' " were at best "two equivocal requests for counsel"); *State v. Hammett-Marette*, 2d Dist. Montgomery No. 28157, 2019-Ohio-394, ¶ 6 (comments that " 'Why shouldn't I have a lawyer at this time? * * * I want some advice; I want to get up out of here, sir' " did not clearly and unambiguously request counsel).

ii.   Comments during Administration of Rights

{¶ 25} The discussion during the administration of rights was quite lengthy, with Harris digressing at points about his dissatisfaction with the fact that his statements could and would be used against him, and his dislike for the Public Defender's Office, which

had represented him in prior cases. Beginning at 16:40 of the video, House read the third *Miranda* warning to Harris, i.e., that Harris had a right to have an attorney present during questioning. State's Ex. 3; Tr. at p. 78. At that time, Harris stated that "I always ask them for a lawyer, because like I said before, I'm not really in the best mindset. I have caseworkers. All I do is go to sleep, work, play my video game, and do it all over." State's Ex. 3 at 16:40:30.

{¶ 26} In response, Det. House asked Harris if he understood that right, that he had a right to an attorney. At that point, Harris said, "I really do need somebody here talking for me." *Id.* at 16:40:47. House then told Harris to place his initials on the pre-interview form next to the line disclosing the right to an attorney and said, "And we'll go through all that. Right now, we're just going through your rights." *Id.* at 16:40:54. At the suppression hearing, House stated that he did not interpret Harris's statements as a request for an attorney, and that Harris did not specifically say that he wanted an attorney with him at that point. Tr. at p. 78. Shortly thereafter, House stated that Harris had the right to have an attorney appointed if he did not have one. State's Ex. 3 at 16:41:00.

{¶ 27} In *Hammett-Marette*, we rejected the trial court's conclusion that similar statements were " 'tantamount to a request for an attorney.' " *Hammett-Marette*, 2d Dist. Montgomery No. 28157, 2019-Ohio-394, at ¶ 5-7 and 25-26. We observed that the defendant's comments that she wanted some advice could not be considered in isolation, but had to be evaluated in light of her preceding statements, which showed some confusion over the part of the form stating that she did not want a lawyer. *Id.* at ¶ 24-25.

{¶ 28} In a similar situation, the Tenth District Court of Appeals made the following observations:

In the case at bar, defendant did not unambiguously, unequivocally request an attorney. Defendant's question, "[c]an I have a public defender?" can be interpreted in two different ways: either defendant was asking whether his rights, as he had just read them, included the right to a public defender or he was asking for access to a public defender. Detective Carney's response - that defendant would be entitled to a public defender if he could not afford to hire an attorney - indicates that he believed defendant wanted a clarification of his rights, not that he sought to invoke his right to counsel. Given the ambiguity inherent in defendant's question, we find that a reasonable police officer would come to the same conclusion, and thus, Detective Carney's decision to question defendant without counsel present did not violate defendant's right to counsel.

*State v. Curtis*, 10th Dist. Franklin No. 05AP-795, 2006-Ohio-4230, ¶ 14.

{¶ 29} The same reasoning applies here. After House's statement indicating that Harris had the right to have an attorney appointed, Harris said, "Well, if that's the case, they should have gave me one when I come in." State's Ex. 3 at 16:42:10. In responding to that statement, Det. House commented that: "You don't get an attorney yet. I mean, you haven't been charged with anything yet. You're just being interviewed." *Id.* at 16:42:23.

{¶ 30} According to Harris, this was an incorrect statement of law, because Harris did, in fact, have a right to counsel and to have an attorney present. However, House's comments cannot be viewed in isolation. Throughout the interview, which lasted more than an hour, House repeatedly told Harris that he had a right to have counsel present

and did not have to speak to officers.   At the suppression hearing, House also explained the context of his comment as follows:

> * * *
>
> A.   And again, that was a simple response to his statement that he should've had one [a lawyer] already.
>
> Q. [Prosecutor] Okay.
>
> A.   And again, I was just simply stating that basically, you know, just because you're brought down there's not an attorney standing by waiting for you when you get here.
>
> Q.   Did he appear to understand that explanation?
>
> A.   Yeah, I don't – as I recall, I don't think he brings it up any further at that point in time and we move forward.
>
> Q.   All right.   Because taken by itself, obviously, it doesn't sound, you know, factually correct.   But you're referring to his statement that he thought, in his impression he thought that an attorney would've been appointed –
>
> A.   Yes, that –
>
> Q.   – when he walked in to the department?
>
> A.   Correct.   An attorney should've already been there, given to him.

Tr. at p. 80.

{¶ 31} The United States Supreme Court has stressed that "[i]n *Miranda* itself, we expressly rejected the suggestion 'that each police station must have a "station house lawyer" present at all times to advise prisoners,' * * * and held instead that a suspect must

be told of his right to have an attorney present and that he may not be questioned after invoking his right to counsel.   We also noted that if a suspect is 'indecisive in his request for counsel,' the officers need not always cease questioning."   *Davis*, 512 U.S. at 460, 114 S.Ct. 2350, 129 L.Ed.2d 362, quoting *Miranda*, 384 U.S. at 474 and 485, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 32} The ambiguity here is underscored by the fact that, in response to Harris's comment, Det. House said, "Are you saying you want a lawyer?"   State's Ex. 3 at 16:42:47.   In response, Harris commented, "That's only if y'all feel like [I] need a lawyer, because I'm getting interviewed about some crazy shit here."   *Id.* at 16:43:00.

{¶ 33} House responded to that remark by saying: "I don't know if you need a lawyer or not.   It all depends on what you tell me.   It's not a matter of what I feel, it's a matter of what you feel.   I want to talk to you about what happened * * * and see what you know.   That's up to you whether you think you need a lawyer or not."   *Id.* at 16:43:04. Again, placed in context, Harris did not ambiguously and unequivocally ask for counsel.

iii.   Post-*Miranda* Comments

{¶ 34} After his *Miranda* rights and the waiver form were read, Harris signed a waiver and agreed to talk to the police.   Harris did not thereafter mention an attorney for about 45 minutes.   At that time, Harris said, "If I ask for a lawyer right now, are y'all going to stop and what, put me in a cell?"   State's Ex. 3 at 17:32:22.   Det. House replied, saying "Do you want a lawyer right now, are you asking for a lawyer?"   In response, Harris said "That's what I'm asking, that's what I'm asking.   I'm asking you."   *Id.* at 17:32:28.   At that time, House stated that "I already told you that you're going to jail

tonight for the misdemeanor assault. . . . We're going to continue to investigate this. We're going to do a search warrant at the house." *Id.* at 17:32:30. House also mentioned other testing the police intended to conduct.

{¶ 35} After these comments occurred, the discussion continued for about six more minutes. At that point, Det. House told Harris that he did not believe his story of finding the cell phone on a dead body, and that he believed Harris had robbed and killed the victim. Harris then said, "Can I get an attorney? Can I get an attorney to come in here and talk to me on my behalf?" *Id.* at 17:39:19. In response, House stated, "If that's what you want, we'll be done right now." *Id.* at 17:39:23. When House stood up and ended the interview, Harris said, "No, we're not done." *Id.* at 17:39:33. Harris continued to protest that he was not finished and that he did not need an attorney. *Id.* at 17:39:41. However, House ended the interview and Harris was taken out to the hallway and handcuffed.

{¶ 36} During this process, Harris told the detectives that he wanted to talk to them, so he was brought back into the interrogation room. At that time, House confirmed that continuing to talk was at Harris's request and choice. *Id.* at 17:41.05. The interview then continued for a few more minutes, during which Harris told the same story, i.e., that he simply happened upon the victim's dead body and took the victim's cell phone. House then ended the interview.

{¶ 37} As noted, a defendant's words are viewed in context, not in isolation. *Murphy*, 91 Ohio St.3d at 520-521, 747 N.E.2d 765. The police also do not have to cease questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that

the suspect *might* be invoking the right to counsel."  (Emphasis sic.)   *Davis*, 512 U.S. at 459, 114 S.Ct. 2350, 129 L.Ed.2d 362.

{¶ 38} Viewing the discussion in context, Harris's first comment about an attorney was not unequivocal, but was an inquiry about whether he would be allowed to go home if he had an attorney.   House's response about the fact that Harris was going to go back to jail for the assault makes the context clear.   *See Murphy*, 91 Ohio St.3d at 521, 747 N.E.2d 765 (defendant's full statement that " 'I'm ready to quit talking and *I'm ready to go home, too.*' " was ambiguous. (Emphasis sic.)).   In this regard, the court in *Murphy* commented that "What appellant appears to have wanted was to be released.   Talking to the police was a means to that end; he was trying to persuade them that he was innocent.   Thus, his words did not necessarily mean that he wanted to stop talking, no matter what.   If the police were not ready to let him go, he may well have wanted to keep trying to persuade them of his innocence."   *Id.*

{¶ 39} Harris's later comment about having an attorney present was a specific request for counsel, and House honored that request, even over Harris's protests that he did not want or need an attorney.   However, Harris then affirmatively asked the police to continue to talk with him.

{¶ 40} The United States Supreme Court has said that "before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.' "   *Oregon v. Bradshaw*, 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), quoting *Wyrick v. Fields*, 459 U.S. 42, 45, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).   In the case before us*,* the video clearly demonstrates that Harris initiated the dialogue and asked to continue

the discussion.

**{¶ 41}** However, "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Bradshaw* at 1044, quoting *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "Such a waiver must be knowing and intelligent and found to be so under the 'totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 52, quoting *Edwards* at 486. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385, 130 S.Ct. 2250, 176 L.Ed.2d 1098.

**{¶ 42}** Here, there was no evidence of coercion or threats. In fact, Harris was insistent that the police continue to talk with him, and his statements after the interrogation was resumed clearly indicated that he was attempting to persuade the officers that he was innocent. During the entire interview, House repeatedly told Harris that he did not have to talk to the officers. In addition, Harris appeared mentally alert, did not appear to be under the influence of alcohol or drugs, and was able to read. Harris spoke freely with the police after they returned to the interrogation room. The State, therefore, met its burden of showing that Harris's waiver was knowing and intelligent under the totality of the circumstances.

**{¶ 43}** Accordingly, the police did not violate Harris's Fifth Amendment rights during the first interview.

## B. The Second Interview

**{¶ 44}** As noted, the police did not find a BB gun or varsity-style jacket when they searched the home where Harris's mother lived. Shortly after Harris's first interview ended, the police obtained a search warrant for Harris's apartment on Catalpa Drive. *See* State's Ex. 1, p. 2 (indicating that a judge signed the search warrant around 6:55 p.m. on September 21, 2017). During this search, the police found a semi-automatic weapon and ammunition under Harris's mattress, and also located the varsity-style jacket. At that point, the police had substantial evidence connecting Harris to the crime, including statements of witnesses who saw Harris brandishing a gun (and not a BB gun) the evening of the crime; the victim's cell phone, which was found in Harris's pocket when he was arrested; a semi-automatic gun and ammunition; and the varsity-style jacket that people saw Harris wearing that night.

**{¶ 45}** On September 23, 2017 (a Saturday), the police again brought Harris to the Safety Building for another interview. By that time, the police had interviewed additional individuals and had also conducted a search of the Catalpa apartment. As a result, the police wanted to discuss the additional information with Harris. Tr. at p. 88.

**{¶ 46}** This interview began around 3:00 p.m., and was also captured on video. *See* State's Ex. 5. At the beginning of the interview, Det. House told Harris why they brought him over from the jail and went over the pre-interview form with him. Tr. at p. 89; Ex. 5 at 14:04:45. When House explained that Harris had a right to an attorney,

Harris indicated that he thought he was coming there that day to talk with an attorney. *Id.* at 15:05:46. During this discussion, House indicated that some type of miscommunication must have occurred, because he had asked the jail to have Harris brought over for a police interview, not for a visit with an attorney. *Id.* at 15:06:01; Tr. at pp. 90-91.

{¶ 47} After House asked Harris if he wanted to talk with the police, Harris said that he did. House then again read the part of the *Miranda* warnings involving Harris's right to have an attorney. At that point, Harris said, "Can I have a lawyer?" *Id.* at 15:07:28. After House told Harris that he could have a lawyer, Harris asked if the police could call the Public Defender. *Id.* at 15:07:33.

{¶ 48} In response, House said, "If you want a lawyer before you talk to us, we can do that, but it's not going to happen today. The Public Defender's Office isn't working right now. . . . I just want you to understand, it's your right. You can have a lawyer with you before you answer any questions. The only thing that would happen is we would just stop for today. We wouldn't ask you . . . we wouldn't go any further. We would take you back over [to the jail]." *Id.* at 15:07:38; Tr. at p. 89.

{¶ 49} Det. House explained at that point that Harris would have an arraignment on Monday, and he would be given an attorney at that time. Tr. at 89. House then said:

> But I just want you to understand that we can't talk to you right now
> without your permission and without a lawyer present. . . you have to give
> us permission to do that. Alright? And it's your right . . . . If you want to
> wait until you get a lawyer appointed to you or hire an attorney, that's your
> right. I'm not here to try and pressure you to make you talk to us. But I'm

just telling you, there are . . . right now, I do want to talk to you. But that's your right. . . . You can wait, and it's completely up to you.

State's Ex. 5 at 15:08:30; Tr. at 89.

{¶ 50} At that point, Harris said that he wanted to continue, and then began reading from the rights form. State's Ex. 5 at 15:09:01. Det. House then finished reading the *Miranda* rights to Harris, and Harris initialed them. During the reading of the wavier form, the following exchange occurred:

> Det. House: If you could, read that paragraph out loud.
>
> Harris: The above statement of rights has been read to me, and I comprehend what my rights are. I'm willing to make a statement. I'm willing to answer questions. I do not want a lawyer. Well, now, I can't say that. I can't say that . . . .
>
> Det. House: Well, if you read a little bit further, it says at this time.

*Id.* at 15:13:37-15:14:04.

{¶ 51} Thereafter, Harris did not make any further comments about counsel. Instead, he continued to read the waiver form out loud. When he finished, Det. House also read the form out loud. Harris then signed the waiver form and indicated that he wanted to talk to the police. *Id.* at 15:15:59; Tr. at 93.

{¶ 52} During the subsequent interview, Harris admitted that he shot Perkins, but claimed it occurred after Perkins sprayed Harris and another man with mace. Harris further claimed that he did not have a gun, but had picked up and used Perkins's own gun, which Perkins had dropped during a fight that occurred after Perkins used the mace. According to Harris, the shooting was done in self-defense.

{¶ 53} After applying the criteria discussed above, we agree with the trial court that Harris did not clearly and unambiguously invoke his right to counsel.  The police, therefore, were not required to stop questioning him.  *See State v. Stover,* 9th Dist. Lorain No. 96CA006461, 1997 WL 193333, *2 (Apr. 16, 1997) (defendant's statement that he wanted to talk to detectives, but would like to have his lawyer there, was not an unambiguous, unequivocal request for counsel); *State v. Henness*, 79 Ohio St.3d 53, 62, 679 N.E.2d 686 (1997) (statement that " 'I think I need a lawyer' " was ambiguous); *State v. Winton*, 2d Dist. Montgomery No. 27043, 2017-Ohio-6908, ¶ 52 (defendant's statements that " 'maybe' a lawyer should be present, and that he 'probably' needed an attorney" were not unambiguous requests for counsel, and were also qualified by "his statements that he wanted to cooperate and that he was willing to be interviewed without an attorney").

{¶ 54} Accordingly, the trial court did not err in refusing to suppress Harris's statements to the police during the second interview.   Harris's sole assignment of error, therefore, is overruled.


III.   Conclusion

{¶ 55} Harris's assignment of error having been overruled, the judgment of the trial court is affirmed.


HALL, J., concurs.


DONOVAN, J., dissents:

**{¶ 56}** I disagree. Harris invoked his right to counsel during custodial interrogation multiple times.  The majority denigrates the "settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel * * *." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), *overruled on other grounds*, *Montejo v. Louisiana*, 556 U.S. 778, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). Harris's initial statements regarding his right to counsel were not qualified. They were not ambiguous. They were not equivocal. Det. House engaged in a pattern of diversion, interruption and responses designed to persuade Harris to rescind his invocation of his right to counsel. Det. House sought to create ambiguity by his comments in the face of Harris's clear desire to speak through a lawyer.

**{¶ 57}** Harris's statements should not be viewed in isolation; context matters. "A proper inquiry into the words of a suspect under custodial interrogation requires examining not only the words presented but their context." Hebert, *Context is King: Lawyer Dogs, Pure Applesauce, and Your Miranda Right to Counsel*, 92 Tul.L.Rev. Online 1 (2018).

**{¶ 58}** "When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights…[He] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards,* 451 U.S. at 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378.  It is evident from the record that Harris did not

initiate the second interview.

{¶ 59} Examining this case in light of the totality of circumstances as we must, *State v. Barker*, 53 Ohio St.2d 135, 372 N.E.2d 1324 (1978), I conclude there was never an effective waiver of *Miranda* rights and that Harris made clear his desire for counsel. Quite simply, Det. House sought to deter Harris from the beginning of exercising a right which Harris himself knew he possessed. Case law is clear that police may not "badge[r] a defendant into waiving his previously asserted" right to counsel. *McNeil v. Wisconsin,* 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991).

{¶ 60} Harris's initial decisive questions and declarations were sufficiently clear that a reasonable police officer under the circumstances would have understood Harris's statements to be a request for an attorney. This analysis should not be based on the subjective belief of Det. House, but rather is an "objective inquiry." *State v. Hatten,* 186 Ohio App.3d 286, 2010-Ohio-499 ¶ 57 (2d Dist.); *Sessom v. Grounds,* 776 F. 3d 615, 629 (9th Cir. 2015).

{¶ 61} Significantly, the sequence of Harris's declarations, demands and questions are critical to the analysis. The majority has parsed out Harris's statements regarding an attorney in a manner that in my view, does not provide a clear and complete picture of what transpired.   Harris tried very hard and repeatedly to consult with an attorney prior to questioning. Critically, I shall lay out sequentially the exchanges between Harris and the detective(s):

(First Interview, September 21, 2017)

(16:31:50)

Officer: What is your date of birth?

Harris: **Why can't I have a lawyer talk to me while I'm here**?

Officer: We're going to go over that with you.

Harris: **You could have told me that before you started questioning me**.

Officer: I'm not questioning you.

* * *

(16:36:45)

Officer: Do you want to go through the rights?

Harris: **I have the right to talk to a lawyer**.

Officer: Ok. We're going to go through each one.

16:37:50 –

Officer: Yes, you are being interviewed in regard to the crime of homicide.

Harris: **I can still get a good lawyer**.

Officer: **That all depends on what comes out, I don't know what you want to tell us**.

* * *

(16:40:30)

Officer: * * * You have the right to talk to a lawyer for advice before we ask you any questions, and to have a lawyer with you during questioning. Do you understand that?

Harris: * * * **I always ask for a lawyer**. * * * I'm not really in the best mindset. I have caseworkers. * * *

Officer: **So, you understand that one. That you have the right to an attorney**.

Harris: **Yea, I need somebody. I really do need somebody here talking for me**.

Officer: Well put your initials next to number three, and we'll go through all that, right not we're just going over your rights.

* * *

(16:42:20)

Officer: * * * **You understand that if you don't have money, they're going to give you an attorney? Can you put your initials next to there saying you understand it?**

Harris: **If that's the case they should have gave me one when I came in here.**

Officer: **You don't get an attorney yet. I mean, you're not charged with anything. You're just being interviewed.**

* * *

(16:42:45)

Officer:   * * * You also have the right to stop answering anytime until you talk to a lawyer. Do you understand that?

Harris: **I do want** (inaudible) * * * **I'm trying to tell you** (inaudible) * * * **. I don't want anyone to say or try to mind f\*\*k me.**

Officer: You saying you want a lawyer?

Harris: That's only if y'all feel like y'all need a lawyer. * * *

Officer: I don't know if you need a lawyer or not, it all depends on what you tell me. It's not a matter of what I feel, it's a matter of what you feel. I want

to talk to you about what happened. * * *

* * *

(16:45:50)

Officer: **I'm going to read this to you. Alright, it's called the waiver of rights.**

Harris: **<u>I'm not, I'm not about to sign that part until,</u> you know what I'm saying, like till what's his name * * *** (interruption).

Officer: Well, let me read it and you tell me if you understand it, and then you tell me what you want to do. Ok? * * *

Harris: Yes, sir.

* * *

(16:46:30)

Officer: Do you know what coercion means?

Harris: **Yea, I feel pressured. I really do.**

Officer: And what type of pressure do you feel? What's anyone done to you, to make you feel pressured?

Harris: Honestly, coming up to my job with a whole lot of police officers.

* * *

(16:47:25)

Officer: * * * I want to talk to you about, not someone named Robby getting slapped. I want to talk to you about a guy getting killed. Alright? That's what I want to you about. Now if you are willing to talk to us about it, you can sign the form, we'll discuss it. If you don't want to talk to us, if you want to wait

until you have an attorney, or whatever that's up to you. Let me know. **Do you want to discuss it with us, or not?**

**(Harris remains silent.)**

(Conversation is redirected by the Detective and

brought back to the issue of signing the form.)

(16:49:40)

Officer: If you are willing to talk to us. If you want to talk to us about this, just sign your name right there, and then I'll sign it and detective Phillips will sign it.

* * *

(16:49:50)

(Harris sighs and signs waiver form.)

* * *

(17:32:20)

Officer: We can stop at any point. You let us know.

Harris: If I ask for a lawyer right now, are you going to stop and what put me in a cell?

Officer: **Do you want a lawyer, are you asking for a lawyer?**

Harris: **That's what I'm asking. * * ***

Officer: I already told you that you're going to jail tonight for the misdemeanor assault.

* * *

(17:39:20)

Officer: * * * Absolutely, I'm going to use those lies against you, * * * but what we're trying to do is give you the opportunity to be honest and tell the truth.

Harris: **Can I get an attorney? Can I get somebody in here to talk to me on my behalf.**

Officer: If that's what you want we'll be done right now.

(17:39:45)

Officer: You asked for an attorney, we're done.

Harris: * * * **I need an attorney, because of everything you were saying.**

* * *

Officer: If you feel you need an attorney (interruption).

Harris: No, I don't need an attorney, that's what I'm trying to tell you.


(Second Interview, September 23, 2017)

(15:05:45)

Officer: **Number three, you have the right to talk to a lawyer for advice before we ask you any questions, to have a lawyer with you during questioning. Do you understand that?**

Harris: **I know, and I really want, I wanted … I thought I had a lawyer today.**

Officer: I know you said when, when they contacted you that they told you there was a lawyer visit.

Harris: **They said it was a lawyer, I had to go talk to an attorney today.**

**I thought I was going to talk to my attorney today.**

Officer**: Umm, I don't know what miscommunication came over there.**

(15:07:25)

Officer: We'll go over number three again, because we read it and we had this discussion. It says you have the right to talk to a lawyer for advice before we can ask you any questions, and have a lawyer with you during questioning. You said you understand that, correct? Put your initials next to number three saying you understand it.

Harris: **Can I have a lawyer?**

Officer: **Can you have a lawyer, yes.**

Harris: Call the public defender, nothing?

Officer: If you want a lawyer before you talk to us we can do that, but it's not going to happen today. Umm, the public defender office isn't working right now. * * * I want you to understand it's your right to have a lawyer with you before you answer any questions. The only thing that would happen, we would stop for today. We couldn't ask you, we wouldn't go any further, we would take you back over, and if we decide that we want to talk to you again. Uhh. You'll probably be arraigned on * * * (Detective questions another officer.) Do they arraign on Sunday? You'll be arraigned on Monday. Where you go before the Judge for the first, and you enter a plea. * * *

(15:13:40)

Officer: If you could, read that paragraph out loud.

Harris: **Statement of rights has been read to me. I comprehend what**

**my rights are. \* \* \* I'm willing to answer questions. I do not want a lawyer. Well no, <u>I can't say that, I can't say that.</u>**

Officer: Well if you look further, it says at this time.

Harris: **I understand and know what I'm doing. No promises, no threats . . . well yea a threat has been made to me.**

Officer: What's the threat?

Harris: I can't tell y'all about this man.

Officer: Well who threatened you? You're not talking law enforcement right? Like I haven't threatened you right, detective Philips . . . we haven't threatened you? Are you taking about someone over at the jail or something?

Harris: Yes, sir.

Officer: Are you talking about another inmate, or a corrections officer?

Harris: Both.

Officer: **Ok. Did the correction officer threaten you to try to get you to talk to us, or is something going on with the jail.**

Harris: **It's going on with the jail. <u>They're over there talking about they're not going to feed me.</u>** Where they put me at, they put me in a place so I can try and wild out. They had people over there trying to force me to fight.

Officer: Ok. Whether it was intentional or not you changed some of the words up, so I'm going to read it to you.

\* \* \*

(15:15:50)

Officer: **Do you want to talk to us about what's going on?**

(**No audible response.)**

Officer: Just sign it right there.

(Harris signs the waiver form.)

(Questioning proceeds.)

**{¶ 62}** "Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Furthermore, an accused's *post-request* responses to further interrogation may not be used to case retrospective doubt on the clarity of the initial request for counsel itself. *Id.* "Such subsequent statements are relevant only to the distinct question of waiver." *Id.*

**{¶ 63}** The U.S. Supreme Court emphasized in *Smith* that once an accused requests counsel, as Harris undisputedly did here, "[n]o authority, and no logic, permits the interrogator to proceed ... on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99. This prohibition is not limited to further interrogation. As previously stated, case law is clear that police may not "badger[ ] a defendant into waiving his previously asserted" right to counsel. *McNeil*, 501 U.S. 171, 177, 111 S.Ct. 2204, 115 L.Ed.2d 158. "Once a suspect asserts the right, not only must the current interrogation

cease, but he may not be approached for further interrogation 'until counsel has been made available to him[.]' " *Id.* at 176-77. "If the police do subsequently initiate an encounter in the absence of counsel * * * the suspect's statements are presumed involuntary and therefore inadmissible[.]" *Id.* at 177.

**{¶ 64}** Additionally, the U.S. Supreme Court has recognized that requests for counsel are to be "understood as *ordinary people* would understand them." (Emphasis added.)  *Connecticut v. Barrett*, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).  "[A] suspect need not speak with the discrimination of an Oxford don," however, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362.  As abundantly clear from the above interview, there was no ambiguity regarding what Harris wanted: an attorney.

**{¶ 65}** Under *Davis* and *Smith*, we are required to analyze whether a reasonable officer viewing the situation in light of all of the circumstances leading up to the statements would have understood Harris's statements to constitute requests for counsel.  The conduct of Det. House during the interrogation only sought to divert, undermine, confuse, cajole, and delay Harris's invocation of his right to counsel, which he requested in plain and unambiguous language more than once.

**{¶ 66}** Arguably, any of Harris's statements standing alone would be grounds for reversal. Nevertheless, taken together, Harris's statements and requests for counsel were not honored. No particular form of words have ever been required to trigger an individual's Fifth Amendment protections, nor have requests for counsel been narrowly construed.

Nothing in federal or state law allows the authorities to ignore the tenor or sense of Harris's requests and responses to his *Miranda* warnings. It is settled that any plain reference, however glancing, to a need or desire for representation must result in the cessation of questioning. *See Miranda,* 384 U.S. at 444-445, 86 S.Ct. 1602, 16 L.Ed.2d 694. There is certainly nothing glancing or ambiguous about Harris's final invocation, "I can't say that, I can't say that," as he read aloud, "I do not want a lawyer," from the *Miranda* form. Harris's protestation was decisive and unequivocal, as were multiple statements and requests throughout the two days of interviews. Questioning must cease when the accused "indicates in any manner and at any state of the process that he wishes to consult with an attorney before speaking." *Smith,* 469 U.S. at 95, 105 S.Ct. 490, 83 L.Ed.2d 488, citing *Miranda* at 444-445.

**{¶ 67}** Furthermore, the audio-visual record, without question, illustrates that Harris was misled about the timing of his right to speak with counsel and what, if any, statements could be used against him. State's Exs. 4 and 6 establish, consistent with the recording, that Harris refused to initial that he understood the following right – "Anything you say, can and will be used against you in a court of law." Significantly, Det. House indicated it "depends on what you say." He even provided a narrative of innocent conduct such as distributing food to the homeless. "Injections by the government of interpretive – and potentially misleading – commentary into *Miranda* baseline warnings undermines the prophylactic effects of *Miranda's* procedural mandate." *See United States v. Wysinger*, 683 F.3d 784, 800 (7th Cir.2012); *Hart v. Attorney General State of Florida*, 323 F.3d 884, 893 (11th Cir.2003).

**{¶ 68}** Accordingly, I would reverse. Because Harris invoked his right to counsel,

I would find there was no knowing, intelligent and voluntary waiver of his *Miranda* rights.

. . . . . . . . . . . . .

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Kirsten Knight
Hon. Mary Lynn Wiseman